

Opinions of the United
States Court of Appeals
for the Third Circuit

12-22-1999

# Tai Kwan Cureton, et.al. v. NCAA

Precedential or Non-Precedential:

Docket 99-1222

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation
"Tai Kwan Cureton, et.al. v. NCAA" (1999). *1999 Decisions.* Paper 326.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/326

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed December 22, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-1222

TAI KWAN CURETON; LEATRICE SHAW,
each individually and on behalf of
all others similarly situated,
ALEXANDER WESBY; ANDREA GARDNER

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,

        Appellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 97-00131)
District Judge: Honorable Ronald L. Buckwalter

Argued October 1, 1999

BEFORE: GREENBERG, MCKEE, and STAPLETON,
Circuit Judges

(Filed: December 22, 1999)

David P. Bruton (argued)
Michael W. McTigue Jr.
Drinker Biddle & Reath
18th & Cherry Streets
One Logan Square
Philadelphia, PA 19103
Elsa Kircher Cole
General Counsel
National Collegiate Athletic
 Association
6201 College Boulevard
Overland Park, KS 66211

 Attorneys for Appellant

Andre L. Dennis (argued)
Danielle Banks
Elizabeth R. Leong
Stradley, Ronon, Stevens & Young
2600 One Commerce Square
Philadelphia, PA 19103
Adele P. Kimmel
Trial Lawyers for Public Justice
1717 Massachusetts Avenue, NW
Suite 800
Washington, DC 20036
J. Richard Cohen
Southern Poverty Law Center
400 Washington Avenue
Montgomery, AL 36104

 Attorneys for Appellees

2

Marcia D. Greenberger
Leslie T. Annexstein
Neena K. Chaudhry
National Women's Law Center
11 Dupont Circle, NW, Suite 800
Washington, DC 20036

 Attorneys for Amici Curiae
 American Association of University
 Women, American Civil Liberties
 Union, Center for Women Policy
 Studies, Clearinghouse on Women's
 Issues, The Connecticut Women's
 Education and Legal Fund, Inc.,
 Equal Rights Advocates, National
 Association for Girls & Women in
 Sport, The National Association of
 Social Workers, National Education
 Association, National Partnership
 for Women & Families, Now Legal
 Defense and Education Fund,
 Women Employed, Women's Law
 Project, The Women's Sports
 Foundation, and The YWCA of
 the USA

Edward N. Stoner II
Martha Hartle Munsch
Catherine S. Ryan
Reed Smith Shaw & McClay LLP
435 Sixth Avenue
Pittsburgh, PA 15219
Sheldon Elliot Steinbach
American Council on Education
One DuPont Circle
Suite 835
Washington, DC 20036

 Attorneys for Amicus Curiae
 American Council on Education

3

Paul A. Tufano
General Counsel
Gregory E. Dunlap
Deputy General Counsel
Anthony S. Potter
Assistant General Counsel
Commonwealth of Pennsylvania
Office of General Counsel
333 Market Street
Harrisburg, PA 17101

 Attorneys for Amicus Curiae
 Commonwealth of Pennsylvania
 and Pennsylvania Department of
 Education

John H. Findley
Pacific Legal Foundation
10360 Old Placerville Road,
 Suite 100
Sacramento, CA 95827

 Attorney for Amicus Curiae
 Pacific Legal Foundation

Bill Lann Lee
Acting Assistant Attorney General
Dennis J. Dimsey
Marie K. McElderry
Attorneys
Department of Justice
P.O. Box 66078
Washington, DC 20035-6078

 Attorneys for Amicus Curiae
 United States of America

4

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. INTRODUCTION

This matter comes on before this court on appeal from an order for summary judgment in this action challenging certain academic requirements for participation in varsity athletics promulgated by the National Collegiate Athletic Association ("NCAA"). See Cureton v. NCAA, 37 F. Supp.2d 687 (E.D. Pa. 1999). In particular, the plaintiffs challenge the minimum Scholastic Aptitude Test ("SAT") score requirement for freshman-year varsity intercollegiate athletic participation. While the NCAA also has adopted minimum grade point average ("GPA") requirements, the plaintiffs do not challenge them directly on this appeal.1 We set forth the background of the case at some length.

A. The Parties

Plaintiff Tai Kwan Cureton is an African-American who graduated from Simon Gratz High School in Philadelphia in June 1996 ranking 27th in a class of 305 students. Cureton was a member of the track team and earned both academic and athletic honors as a high school student. Cureton exceeded the NCAA GPA requirements but did not achieve the NCAA required SAT score. Cureton alleged that several NCAA Division I schools recruited him before he obtained his non-qualifying score on the SAT, but that after he took the SAT a lesser number of Division I schools recruited him and such institutions denied him admission and/or athletic financial aid. Cureton, who alleged he lost an opportunity to compete as a freshman in Division I varsity intercollegiate athletics because of NCAA regulations, enrolled in a Division III school.

---

1. The SAT is a nationally recognized standardized test. As an alternative to the SAT, a student athlete may take the ACT, another nationally recognized standardized test. The parties, however, have emphasized the SAT in this action so we discuss only that test.

Plaintiff Leatrice Shaw is an African-American who also graduated from Simon Gratz High School and was ranked 5th in a class of 305 students. Shaw was a member of the track team and earned both academic and athletic honors and was selected for membership in the National Honor Society. Shaw exceeded the NCAA minimum GPA requirement for freshman-year athletic participation, but failed to achieve the minimum required score on the SAT. The Division I school that Shaw entered did offer her athletic financial aid, but she was unable to compete on the track team during her freshman year because of the NCAA regulations at issue here.

Plaintiffs Andrea Gardner and Alexander Wesby are African-American student athletes who exceeded the NCAA minimum GPA requirement for freshman year athletic participation, but failed to achieve the minimum required score on the standardized college admissions tests. Though they originally were not parties, the district court allowed them to intervene by order dated December 18, 1998, pursuant to Fed. R. Civ. P. 24.

The defendant NCAA is an unincorporated voluntary association of more than one thousand members, a majority of which are public and private four-year colleges and universities that conduct varsity intercollegiate athletic programs in the United States. The NCAA member colleges and universities are divided into Divisions. Division I consists of more than three hundred members. The Divisions adopt their own bylaws, although some NCAA bylaws are applicable to all three Divisions. This action concerns a bylaw adopted by Division I and the curtailment of the plaintiffs' opportunity to participate in Division I athletics.

The National Youth Sports Program (the "NYSP"), which is not a defendant but nevertheless is implicated in this case, is a youth enrichment program that provides summer education and sports instruction on NCAA member and non-member institution campuses. The Department of Health and Human Services provides the NYSP with Federal financial assistance. Before 1992, these funds were advanced to the NCAA, but were not diverted for its use. In 1989, the NYSP Fund (the "Fund") was established as a

6

nonprofit corporation to administer the NYSP. Since 1992, the department has granted the financial aid intended for the NYSP directly to the Fund. The Fund is regarded as an NCAA "affiliate."

Before 1971, college freshmen were not allowed to compete in varsity sports. Since then, the NCAA has adopted many rules defining freshman eligibility for varsity intercollegiate athletic competition, but member institutions continue to make individual admissions decisions. One of these rules, Proposition 48, implemented in 1986, required high school graduates to have a minimum 2.0 GPA in 11 academic core courses and a minimum score of 700 on the SAT to be eligible for competition, practice, andfinancial aid based upon athletic ability. Division I implemented the requirement in response to the public's perception that NCAA schools were exploiting student athletes for their talents without concern for whether they graduated. Division I felt compelled to act despite the fact that student athletes were graduating at rates comparable to non-athletes, and African-American student athletes were graduating at higher rates than African-American students who were not athletes. Since 1989, when the NCAA phased in the eligibility requirements, the graduation rates of student athletes, especially African-Americans, have increased.

Division I modified these rules in 1992 when it adopted Proposition 16, which is at issue here. Proposition 16 increased the number of core courses to 13 and utilized an index to determine eligibility based on a formula combining the student's GPA and SAT scores. Using this index, the minimum score for a student with a GPA of 2.0 is 1010 on the SAT. Similarly, a student who scored an 820 on the SAT would need at least a 2.5 GPA to meet the eligibility requirements.[2] As the district court pointed out, this

_____

2. A student athlete not qualifying under Proposition 16 may become a "partial qualifier" if he or she achieves a minimum SAT score between 720 and 810 along with a core GPA that produces a combined score comparable to the combined score required for qualifiers. See Cureton, 37 F. Supp.2d at 691. A partial qualifier cannot compete in intercollegiate athletics during his or her freshman year, but is eligible to receive athletically related financial aid. See id. Shaw, Gardner, and Wesby are partial qualifiers.

7

modification resulted "in a heavier weighting of the standardized test" because the minimum GPA requirement was two standard deviations from the mean, whereas the minimum test score requirement was only one standard deviation from the mean. Cureton, 37 F. Supp.2d at 691.

B. The Action

Cureton and Shaw filed the complaint in this case on January 8, 1997. They alleged the minimum standardized test score component of Proposition 16 had an unjustified disparate impact on African-American student-athletes in violation of regulations promulgated pursuant to Title VI of the Civil Rights Act of 1964, 42 U.S.C. S 2000d et seq., which precludes exclusion from participation in, denial of the benefits of, and discrimination under any program or activity receiving Federal financial assistance on account of race, color, or national origin. The NCAA moved to dismiss the complaint, or alternatively for summary judgment, on the following grounds: (1) there is no private right of action for unintentional discrimination under Title VI or its accompanying regulations; (2) the NCAA is not a"program or activity" subject to Title VI; and (3) the NCAA does not receive Federal funds necessary to subject it to Title VI. The plaintiffs moved for partial summary judgment on the grounds that, as a matter of law, the NCAA was a covered program or activity subject to a Title VI action for unintentional discrimination and was a recipient of Federal financial assistance for purposes of Title VI.

On October 9, 1997, the district court issued an opinion and order denying the NCAA's motion but granting in part and denying in part the plaintiffs' motion for partial summary judgment. See Cureton v. NCAA, No. 97-131, 1997 WL 634376 (E.D. Pa. Oct. 9, 1997). In that opinion, the court determined that there was a private cause of action under Title VI and its accompanying regulations to remedy cases of disparate impact and that the NCAA was a program or activity covered by Title VI. Id. at *2. The court, however, held that it could not conclude on the record before it that the NCAA was a recipient of Federal funds as a result of its relationship with the NYSP. In view of our recent opinion in Powell v. Ridge, 189 F.3d 387 (3d Cir. 1999), recognizing the existence of a private right of action

8

under Title VI, there no longer is an issue on this appeal regarding that point.

Thereafter, following discovery, the plaintiffs and the NCAA again filed cross-motions for summary judgment. By an opinion and order dated March 8, 1999, the district court denied the NCAA's motion but granted the plaintiffs' motion. See Cureton, 37 F. Supp.2d at 715. The district court held that Proposition 16's disparate impact on African-Americans violates Title VI and the regulations issued under it.

The court adopted two distinct theories to support its finding that the NCAA is subject to the prohibitions of Title VI. See id. at 696. First, the court found that the NCAA is an "indirect recipient of federal financial assistance" because it exercises effective control over a block grant given by the United States Department of Health and Human Services to the NYSP.3 See Id. at 694. Second, the court held that Title VI covers the NCAA because member schools, which indisputably receive federal funds, have vested the NCAA with controlling authority over federally funded athletic programs. See Id.

The court then turned to the plaintiffs' argument that the SAT component of Proposition 16 violates Title VI because of its alleged discriminatory disparate impact on African-American student athletes.4 See id. at 696-712. It found that the plaintiffs provided statistical evidence sufficient to

_____

3. The complaint also alleges that the Fund receives money from the Department of Education. Nevertheless, as far as we can ascertain, the record does not contain any evidence to support this conclusion, and it appears that the plaintiffs have prosecuted this case only by arguing that the NCAA receives funds from the Department of Health and Human Services. However, inasmuch as the regulations of each department are parallel, we have cited to both sets of them.

4. A disparate impact case is based upon the idea that "some . . . practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination." Watson v. Fort Worth Bank and Trust, 487 U.S. 977, 987, 108 S.Ct. 2777, 2785 (1988). Many cases have applied this theory to educational institutions and practices. See, e.g., New York Urban League, Inc. v. State of New York, 71 F.3d 1031, 1036 (2d Cir. 1995) (collecting cases).

show that the use of the SAT minimum standard "plainly evince[d] that African-Americans are being selected by Proposition 16 at a rate disproportionately lower than whites sufficient to infer causation." Consequently, the plaintiffs raised a prima facie case of disparate impact discrimination. See id. at 699-701.

The district court rejected the NCAA's argument that Proposition 16 benefits African-Americans because of the alleged increase in graduation rates it has brought about. The court stated that "the alleged beneficial impact (increased graduation rates) redounds at the `back-end' while the adverse impact occurs up-front." Id. at 700. In this regard, it cited Connecticut v. Teal, 457 U.S. 440, 452-56, 102 S.Ct. 2525, 2533-35 (1982), for the principle that racial balance at the end of an employer's entire promotional process does not preclude a plaintiff from making a prima facie case of disparate impact discrimination based on the impact of one component of the process. Where the initial examination used by an employer in the challenged hiring process had a disparate impact, a "bottom-line" justification is not a defense to employer liability. See id. Accordingly, the district court concluded that the NCAA did not have a defense simply because African-Americans enrolled in its member schools after the adoption of Proposition 16 had an enhanced chance of getting a degree.

Inasmuch as the plaintiffs demonstrated that African-Americans are less likely to meet the standards required by Proposition 16 than whites, the burden shifted to the NCAA to show an educational necessity for the bylaw. The district court approved the legitimacy of the NCAA's first proffered goal of raising all student athletes' graduation rates, Cureton, 37 F. Supp.2d at 703, yet found the NCAA's second proffered goal —— closing the gap between white and black student athletes' graduation rates —— not to have been an actual goal of Proposition 16. Furthermore, the court found that there was no legal "support for an educational institution . . . to engage in such a goal." See id. at 704. Next, the court determined that Proposition 16's use of the SAT as a cutoff was not justified by the legitimate goal of increasing student athletes' graduation rates. Id. at 706-12.

Moreover, the court found that the plaintiffs "have shown at least three alternative practices resulting in less racial disproportionality while still serving the NCAA's goal of raising student athlete graduation rates -- not raising them above a certain threshold number. That is all the proof that plaintiffs need to demonstrate under Title VI." Id. at 714.

In view of its conclusions, the district court granted summary judgment to the plaintiffs, and permanently enjoined the NCAA from continued operation and implementation of Proposition 16. See id. at 714-15. Although regarding the matter as ripe for appeal, the court retained jurisdiction. See id. at 715. By order dated March 16, 1999, the district court modified the March 8, 1999 opinion and order so that the NCAA was permanently enjoined from denying student athletes freshmen-year eligibility on the basis of the minimum standardized test score cutoffs in Proposition 16, but nevertheless could use minimum GPA cutoffs. See id. at 716.

Subsequently, the NCAA appealed and unsuccessfully sought a stay in the district court. The NCAA then sought a stay from this court, which we granted on March 30, 1999.5

II. JURISDICTION and STANDARD OF REVIEW

The district court had jurisdiction under 28 U.S.C. S 1331. We have jurisdiction under 28 U.S.C.S 1292(a)(1) as, notwithstanding the district court's entry of a permanent injunction, it has not entered a final judgment. We exercise plenary review on this appeal from the district court's orders on the motions for summary judgment. See Seibert v. Nusbaum, Stein, Goldstein, Bronstein & Compeau, 167 F.3d 166, 170 (3d Cir. 1999). Of course, on this appeal we can remand the matter for entry of a summary judgment in favor of the NCAA if we conclude that on the

_____

5. Plaintiffs filed a cross-appeal on April 8, 1999, which we dismissed by order dated June 11, 1999, as plaintiffs could raise the issues mentioned in the cross-appeal as alternative grounds to affirm. See Rite-Aid of Pa., Inc. v. Houstoun, 171 F.3d 842, 853 (3d Cir. 1999). On July 1, 1999, the district court granted the plaintiffs' motion for class certification. See Cureton, 1999 WL 447313 (E.D. Pa. July 1, 1999). In view of our result, we will not make further reference to the certification.

undisputed facts it is entitled to a summary judgment as a matter of law. See Nazay v. Miller, 949 F.2d 1323, 1328 (3d Cir. 1991).

III. DISCUSSION

Plaintiffs brought this action pursuant to section 601 of Title VI, which provides:

> No person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, or be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. S 2000d. The Supreme Court has determined that section 601 prohibits discrimination in or exclusion from Federally financially assisted programs or activities only on the basis of intentional discrimination. See Alexander v. Choate, 469 U.S. 287, 292-93, 105 S.Ct. 712, 716 (1985); Guardians Ass'n v. Civil Service Comm'n, 463 U.S. 582, 103 S.Ct. 3221 (1983); Powell, 189 F.3d at 392. But the plaintiffs do not allege intentional discrimination. Accordingly, they rely on regulations implementing section 601, which the Departments of Health and Human Services and Education adopted pursuant to section 602 of Title VI which provides, in relevant part:

> Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract . . ., is authorized and directed to effectuate the provisions of [Section 601] of this title with respect to such program or activity by issuing rules, regulations or orders of general applicability. . . .

42 U.S.C. S 2000d-1. These regulations extend section 601 to racial, color and national origin discrimination predicated on recipients administering programs and activities with a disparate impact.

But section 601 and the regulations have their limitations, for they are enforceable only against the recipients of Federal financial assistance. See 42 U.S.C. S 2000d. The NCAA asserts that it is not a direct recipient

12

of Federal financial assistance and that its relationship with third parties does not support the extension of Title VI coverage to the NCAA as an indirect recipient of such assistance.

The district court recited four different theories that the plaintiffs proffered to support the extension of Title VI coverage to the NCAA:

> (1) that the NCAA directly receives federalfinancial assistance through the Fund (which indisputably is a recipient of federal funds) because the Fund is nothing more than the NCAA's alter ego; (2) that the NCAA indirectly receives federal financial assistance through the Fund due to the NCAA's complete control over the Fund; (3) that member schools who receive federal funds have created and comprise the NCAA and that the NCAA governs its members with respect to athletics rules; and (4) that recipients of federal financial assistance have ceded controlling authority over a federally funded program to the NCAA, who then becomes subject to Title VI regardless of whether it is itself a recipient.

Cureton, 37 F. Supp.2d at 694 (emphasis added).

The district court rejected the first theory, as it concluded that there was insufficient evidence to establish that the NYSP was the alter ego of the NCAA.

The court did conclude, however, that the NCAA was an indirect recipient of Federal financial assistance because "although the Fund is the named recipient of the block grant, it is merely a conduit through which the NCAA makes all of the decisions about the Fund and the use of the federal funds." Id. The NCAA, on the other hand, asserts that there is no evidence to support a finding that the NCAA itself controls the Federal monies disbursed by the Fund.

The court alternatively determined that the NCAA was subject to Title VI coverage because of its relationship to its member institutions. The court stated:

> Whether characterized as a `delegation' or an `assignment' of `controlling authority,' `regulation,' or

13

`supervision,' Plaintiffs have established on this record that the member colleges and universities have granted to the NCAA the authority to promulgate rules affecting intercollegiate athletics that the members are obliged to abide and enforce. Under these facts, the NCAA comes sufficiently within the scope of Title VI irrespective of its receipt of federal funds.

Cureton, 37 F. Supp.2d at 696.

The district court was aware of National Collegiate Athletic Ass'n v. Smith, 119 S.Ct. 924 (1999), which determined that the mere fact that the NCAA received funds from members that received Federal financial assistance did not subject the NCAA to coverage under Title IX of the Education Amendments of 1972. See Cureton, 37 F. Supp.2d at 693. While the district court regarded that case as "applicable" under Title VI, it noted that the Supreme Court left open the possibility that the NCAA could be subject to Title IX coverage on the basis of some other theory. See id. (citing NCAA v. Smith , 119 S.Ct. at 929). Thus, the district court concluded that the NCAA was subject to Title VI.

We do not find it necessary to determine whether, by reason of the NCAA's relationship with the NYSP or the Fund, we should regard the NCAA as receiving Federal financial assistance. Rather, we will assume without deciding that these relationships are sufficient to establish that Federal financial assistance to the Fund is assistance to the NCAA itself. But section 601, as originally written, did not preclude recipients of Federal financial assistance from discriminating with respect to a program not receiving such assistance. Thus, the language of Title VI is program specific as it relates to "participation in," "[denial of] the benefits of " or "discrimination under" "any program or activity receiving Federal financial assistance." See Grove City College v. Bell, 465 U.S. 555, 570-71, 104 S.Ct. 1211, 1220 (1984) (Title IX); Board of Pub. Instruction v. Finch, 414 F.2d 1068 (5th Cir. 1969) (Title VI).

It thus follows that when Congress enacted Title VI, a department's authority to promulgate regulations under section 602 to effectuate the provisions of section 601 was

14

subject to the program specific limitations of section 601. See North Haven Bd. of Educ. v. Bell, 456 U.S. 512, 538, 102 S.Ct. 1912, 1926 (1982); see also Grove City, 465 U.S. at 570-71, 102 S.Ct. at 1220. Consequently, when the departments adopted the regulations under Title VI, see 45 C.F.R. S 80.3 and 34 C.F.R. S 100.3, the regulations, though expanding on section 601 by precluding the use of "criteria or methods of administration which have the effect of subjecting individuals to discrimination," only related to programs or activities receiving Federal financial assistance. See 45 C.F.R. S 80.3(b)(2); 34 C.F.R.S 100.3(b)(2). Thus, the regulations, like the statute, are program specific.

Moreover, the regulations themselves demonstrate that they are program specific. Under the regulations, an application for Federal financial assistance to carry out a program must include assurances of nondiscrimination which may go beyond the program to be Federally assisted. Thus, 45 C.F.R. S 80.4(d)(2) and 34 C.F.R.S 100.4(d)(2) provide that "[t]he assurance required with respect to an institution of higher education . . . or any other institution . . . shall be applicable to the entire institution unless the applicant establishes . . . that the institution's practices in designated parts or programs of the institution will in no way affect its practices in the program of the institution for which Federal financial assistance is sought." Clearly, these provisions cannot possibly accommodate a reading of the regulations so that as a matter of course their discriminatory impact aspects are applied beyond the specific program receiving Federal assistance. We are constrained to reach this conclusion, as it is obvious that a recipient of Federal financial assistance need not give an assurance of nondiscrimination with respect to programs in no way affecting the Federally assisted program.

It is, of course, true that in response to the Supreme Court's program specific interpretation of Title IX in Grove City, Congress passed the Civil Rights Restoration Act of 1987 and thereby modified Title VI so that it encompasses programs or activities of a recipient of Federalfinancial assistance on an institution-wide basis. See 42 U.S.C. S 2000d-4a (Title VI); 20 U.S.C. S 1687 (Title IX); see also NCAA v. Smith, 119 S.Ct. at 928 & n.4 (After passage of

15

Civil Rights Restoration Act, "if any part of the NCAA received federal assistance, all NCAA operations would be subject to Title IX."). Nevertheless, the Departments of Health and Human Services and Education have not modified 34 C.F.R. S 100.13 and 45 C.F.R.S 80.13 following enactment of the Restoration Act. Consequently, the regulations, which, unlike Title VI include disparate impact provisions, by their terms remain program specific. It therefore inexorably follows that, to the extent this action is predicated on the NCAA's receiving Federal financial assistance by reason of grants to the Fund, it must fail as the Fund's programs and activities are not in issue in this case.

In reaching our result, we also point out the following. Neither Congress nor the Departments of Health and Human Services or Education has considered, at least in a formal proceeding of which we are aware, what the consequences would be if the disparate impact regulations were expanded beyond their current program specific limitations. It might well be that such expanded regulations could subject all aspects of an institution of higher education's activities to scrutiny for disparate discriminatory impact beyond anything Congress could have intended. Furthermore, the regulations have not been amended pursuant to the notice and comment provisions of the Administrative Procedure Act. Surely, such an expansion should not be made without the opportunity for comment by interested parties. See 5 U.S.C.S 553; see also NLRB v. Wyman-Gordon Co., 394 U.S. 759, 764, 89 S.Ct. 1426, 1429 (1969).

We realize, of course, that arguably the Civil Rights Restoration Act implicitly expanded the scope of"program" within 45 C.F.R. S 80.13 and 34 C.F.R. S 100.13 so that it is not limited to a specific activity; after all, without such expansion there would be no regulations dealing with disparate treatment by reason of race, color, or national origin beyond the program actually receiving Federal financial assistance. We, however, will not address that possibility here beyond pointing it out, as this case does not involve any allegation of disparate treatment. Consequently, we have no reason to consider whether the

16

regulations under section 602 could be applied in disparate treatment cases on an institution-wide basis.

We note that the dissent points out that the Fund may be the alter ego of the NCAA. See Maj. Op. at 13. It seems quite clear in view of our conclusions with respect to the limited scope of the regulations, with which the dissent agrees, that it is immaterial whether the Fund is the NCAA's alter ego inasmuch as the discriminatory impact aspects of the regulations only can be applied to the specific program receiving Federal assistance and the Fund's programs are not in issue here. See Grove City, 465 U.S. at 571-72, 104 S.Ct. at 1220-21 (holding that Title IX only applied to college's financial aid program, for which federal funds were earmarked, and not to the entire institution). Moreover, as we have pointed out the plaintiffs have not alleged that this is a discriminatory treatment case. Accordingly, even if the NCAA directly received the Federal financial assistance paid to the Fund our result would be the same.

The foregoing conclusions bring us to the question of whether the NCAA is a recipient of Federal funds by reason of what the plaintiffs call its "controlling authority" over programs or activities receiving Federal financial assistance. The case law suggests that the critical inquiry in determining whether an entity is an indirect recipient of Federal assistance is whether that entity is the intended recipient of Federal funds, intention being from Congress's point of view. See id. at 563-65 & n.13, 104 S.Ct. at 1216-17 & n.13. The Supreme Court, however, already has found no indication that member schools paid their dues to the NCAA with Federal assistance funds "earmarked" for that purpose. NCAA v. Smith, 119 S.Ct. at 929. Thus, the controlling authority argument can be sustained, if at all, only on some basis beyond the NCAA's mere receipt of dues. See id. at 929-30. Of course, in considering this "controlling authority" argument, we emphasize that under the applicable regulations only "recipients" of Federal financial assistance are subject to the disparate impact regulations, not merely organizations which have some relationship with entities receiving such assistance or organizations which benefit from such assistance. See

17

United States Dep't of Transp. v. Paralyzed Veterans of Am.,
477 U.S. 597, 605–07, 106 S.Ct. 2705, 2710–12 (1986).

In Horner v. Kentucky High School Athletic Ass'n , 43 F.3d
265, 272 (6th Cir. 1994), the court held that the Kentucky
State Board for Elementary and Secondary Education and
the Kentucky High School Athletic Association, its agent to
manage interscholastic sports, were subject to Title IX. But
in that case, the Board controlled and managed on behalf
of the Kentucky Department of Education over $396 million
in Federal funds. Furthermore, the Association was its
agent authorized by statute to manage interscholastic
athletics.6 On the other hand, more recently the court in
Smith v. Metropolitan School District, 128 F.3d 1014, 1019–
21 (7th Cir. 1997), held that individuals in a supervisory
capacity are not liable in an action under Title IX because
they are not recipients of Federal funds notwithstanding
the circumstance that they may have some control over the
funds.7 Of course, Title IX cases are instructive in this Title
VI action as the statutes are essentially similar. See NCAA
v. Smith, 119 S.Ct. at 928 n.3; see also Paralyzed Veterans,
477 U.S. at 600 n.4, 106 S.Ct. at 2708 n.4.

While not a Title VI or Title IX case, we find the Supreme
Court's decision in NCAA v. Tarkanian, 488 U.S. 179, 109
S.Ct. 454 (1988), instructive, as that case makes clear that
the NCAA does not "control" its members. Tarkanian was a
tenured coach, whom the University of Nevada at Las Vegas
(UNLV) reluctantly had suspended under threat of NCAA
sanctions. He then brought an action under 42 U.S.C.
S 1983 claiming that the NCAA was a state actor, because

_____

6. Actually, Horner was an appeal from an order for summary judgment,
so the court based its holding on the plaintiffs' opposition to the
defendants' motion. It remained for the plaintiffs to prove their case on
the remand.

7. In Davis v. Monroe County Board of Education, 119 S.Ct. 1661 (1999),
a Title IX sexual harassment case against a school board and individual
officials, the district court dismissed the action against all the
defendants. While the case reached the Supreme Court, the Court did
not comment on the case against the individuals, as the plaintiffs
appealed the dismissal of the Title IX claims only against the school
board to the court of appeals. Id. at 1668; see Davis v. Monroe County
Bd. of Educ., 74 F.3d 1186, 1188 n.1 (11th Cir. 1996).

the "UNLV delegated its own functions to the NCAA, clothing the [NCAA] with authority both to adopt rules governing UNLV's athletic programs and to enforce those rules on behalf of UNLV." Id. at 192, 109 S.Ct. at 462. The Court held that the NCAA was not a state actor. While the Court recognized that the NCAA's rules and recommendations clearly influenced the UNLV, it concluded that the UNLV, not the NCAA, took the final action suspending Tarkanian. See id. at 192, 109 S.Ct. at 462.

The Court reasoned that the UNLV "delegated no power to the NCAA to take specific action against any university employee. The commitment by UNLV to adhere to NCAA enforcement procedures was enforceable only by sanctions that the NCAA might impose on UNLV itself." Id. at 195-96, 109 S.Ct. at 464. The Court explained that the UNLV had the option to retain Tarkanian and risk sanctions, perhaps even expulsion, or to withdraw voluntarily from the NCAA. See id. at 197-98, 109 S.Ct. at 465. The Court questioned Tarkanian's assertion that "the power of the NCAA is so great that the UNLV had no practical alternative to compliance with its demands." Id. at 198-99, 109 S.Ct. at 465. It stated that "[t]he university's desire to remain a powerhouse among the Nation's college basketball teams is understandable, and nonmembership in the NCAA obviously would thwart that goal. But that UNLV's options were unpalatable does not mean that they were nonexistent." Id. at 198 n.19, 109 S.Ct. at 465 n.19.

Similarly, the ultimate decision as to which freshmen an institution will permit to participate in varsity intercollegiate athletics and which applicants will be awarded athletic scholarships belongs to the member schools. The fact that the institutions make these decisions cognizant of NCAA sanctions does not mean that the NCAA controls them, because they have the option, albeit unpalatable, of risking sanctions or voluntarily withdrawing from the NCAA. In this regard, we point out that this case differs from Horner as there the Athletic Association was exercising public authority with respect to its functions. We emphasize that the NCAA members have not ceded controlling authority to the NCAA by giving it the power to enforce its eligibility rules directly against students.

19

We also point out that applying the disparate impact regulations to the NCAA is inconsistent with the contractual character of section 601. The Supreme Court explained in Paralyzed Veterans that the antidiscrimination provisions in section 504 of the Rehabilitation Act of 1973, 29 U.S.C. S 794, which has language tracking Title VI, have a contractual basis. Accordingly, the Court said that "Congress limited the scope of S 504 to those who actually `receive' federal financial assistance because it sought to impose S 504 coverage as a form of contractual cost of the recipient's agreement to accept federal funds." 477 U.S. at 605, 106 S.Ct. at 2711. Thus, "[b]y limiting coverage to recipients, Congress imposes the obligations ofS 504 upon those who are in a position to accept or reject those obligations as a part of the decision whether or not to `receive' federal funds." Id. at 606, 106 S.Ct. at 2711.

Title VI is a similar statute. See 45 C.F.R.S 80.4; 34 C.F.R. S 100.4. But there is no contractual privity between the Departments of Health and Human Services and Education and the NCAA with respect to Federal financial assistance to the NCAA members. Therefore, the NCAA is not in a position to accept or reject the Federal funds paid to those institutions. We do not suggest that an absence of privity means that in no circumstances may a controlling authority argument be viable; we note that those who truly assume control of federally-funded programs are in a position to accept or reject that control as part of a decision whether or not to receive federal funds indirectly. Nonetheless the absence of privity clearly signals that a court should be circumspect in imposing Title VI obligations on an entity which is not a direct recipient of Federal financial assistance. Such caution is consistent with the Spending Clause foundation for Title VI. See Davis v. Monroe County Bd. of Educ., 119 S.Ct. 1661, 1669-70 (1999).

We recognize that the dissent suggests that the NCAA constitution requires NCAA members to cede authority over their athletic programs to the NCAA, but the NCAA constitution expressly provides for the retention of institutional control over individual athletic programs. While the constitution requires conformity with the NCAA's

rules and regulations, the ultimate decisions whether to conform are made by individual members. Therefore, the constitution is completely consistent with our result. Furthermore, we cannot understand how the fact that the NCAA promulgates rules and regulations with respect to intercollegiate athletics somehow means that the NCAA has controlling authority over its members' programs or activities receiving Federal financial assistance. After all, the institutions decide what applicants to admit, what employees to hire, and what facilities to acquire.

IV. CONCLUSION

In view of the foregoing determinations, it is unnecessary for us to reach the other issues raised on this appeal. Moreover, inasmuch as the parties agree that there are no disputes of material fact with respect to the question of whether the NCAA is subject to Title VI (and we are aware of none), and we have concluded that the NCAA is entitled to a judgment as a matter of law, there is no reason why this litigation should continue. Consequently, we will reverse the order of the district court of March 8, 1999, and will remand the case to the district court to enter summary judgment for the NCAA.

McKEE, Circuit Judge, concurring in part and dissenting in part.

I agree with the majority's analysis insofar as my colleagues conclude that the District Court's grant of summary judgment can not be sustained under the applicable regulations of the Departments of Health and Human Services and the Department of Education. As I discuss below, the language of the regulations those agencies adopted pursuant to SS 601 and 602 of Title VI are program-specific. Accordingly, it appears that the relief for the discriminatory impact that the District Court found under Proposition 16 must be limited to the National Youth Sports Program (the "Fund"). However, I believe that the NCAA may well be subject to Title VI under the plaintiff 's theory that the NCAA is a controlling entity of its member institutions, or the alternative alter ego theory advanced by the plaintiffs. Thus, I can not agree with the majority's analysis insofar as it holds that the NCAA is entitled to summary judgment. Rather, I believe that we should remand for a trial to resolve the issue of whether the NCAA is a controlling entity under Title VI or the Fund is merely its alter ego. However, before explaining my position, a brief parenthetical is necessary.

Title VI extends protection based upon race, color or national origin. Accordingly, this dispute is framed by issues of race. Nevertheless, the issues here are of such gravity, and the social context in which they arise are of such magnitude, that I think it is important that an aspect of this controversy not be lost even though it is irrelevant to our legal analysis. Buried deep within this record is a statement that is of such consequence that it ought not to be ignored. Yet, that statement has been lost in the intensity of the debates underlying this legal dispute. The NCAA's Rule Change Memorandum contains the following statement:

> Low-income student-athletes also have been impacted
> to a greater degree than other student-athletes by
> Proposition 16 standards. For example, in 1997, 18
> percent of all student-athletes with a self-reported
> family income below $30,000 failed to qualify, whereas

22

> only 2.5 percent of student-athletes with a family
> income greater than $80,000 failed to qualify.

JA at 756a. Proposition 16 therefore has a disparate impact on poor student-athletes regardless of race. Thus, the dynamics of the disparate impact here are the dynamics of socio-economic status. These are issues of class; not race. Student athletes are more likely to be adversely affected by Proposition 16 whether they are Black or White if they are poor. Concomitantly, student athletes are more likely to be advantaged by Proposition 16 if they have attended schools with abundant resources and are from families that know about, and have the resources to avail themselves of, the proliferation of privately sponsored courses that prepare high school students for the SAT exam. See Los Angeles Times, More Latinos Take SAT Exams But Scores Lagging, Sept 2, 1998, at A1 ("Suburban and affluent students . . . enjoy another advantage--greater access to commercial test preparation courses that can add 120 points or more to a student's SAT score."). The economic stratification that exists in our society often means that issues of class are either translated into issues of race, or the two are so intertwined as to be inseparable.

Because we function as a court of law, and not as a legislature, the significance of the NCAA's Memorandum can play no role in our adjudication of this appeal. However, the explosiveness of the issues lying coiled just below the surface of this dispute require that the broader implications of this debate be kept in proper perspective.[1]

I. The Applicable Regulations.

I begin my legal analysis with the regulations that have been promulgated under Title VI. 34 C.F.R. S 100.3 promulgated by the Office of Civil Rights of the Department of Education provides in relevant part that:

> (b)(2) A recipient [of funds under Title VI], in
> determining the types of services, financial aid, or

---

1. This observation is not intended to detract from, or add to, the discussion of the cultural bias that many believe also influences SAT scores.

23

> other benefits, . . . or the class of individuals to whom,
> or the situations in which, such services, . . . will be
> provided under any such program, or the class of
> individuals to be afforded an opportunity to participate
> in any such program, may not, directly or through
> contractual or other arrangements, utilize criteria or
> methods of administration which have the effect of
> subjecting individuals to discrimination because of
> their race, color, or national origin, or have the effect of
> defeating or substantially impairing accomplishment of
> the objectives of the program as respect individuals of
> a particular race, color, or national origin.

34 C.F.R. S 1003(b)(2). The cited Authority for that
regulation is "Sec. 601, 602, 604, Civil Rights Act of 1964;
78 Stat. 252, 253, 42 U.S.C. 2000d, 2000d-1m 2000d-3."
The Department of Health and Human Services
promulgated an identical regulation at 45 C.F.R.
S 80.3(b)(2), and the identical provisions of The Civil Rights
Act of 1964 are cited as authority for that regulation. As the
majority notes, the scope of these regulations is limited by
34 C.F.R. S 100.4(d)(2) and 45 C.F.R. S 80.4(d)(2)
respectively. That limitation provides that the respective
prohibition of discrimination "shall be applicable to the
entire institution unless the applicant establishes . . . that
the institution's practices in designated parts or programs
of the institution will in no way affect its practices in the
program of the institution for which Federal financial
assistance is sought." See Maj. Op. at 15.[2]

As the majority explains, this limitation is a direct result
of the original interpretation of Title VI. See Grove City v.
Bell, 465 U.S. 555 (1984). Maj. Op. at 15-16. However,
Congress subsequently enacted the Civil Rights Restoration
Act, 42 U.S.C. S 2000-4, and thereby broadened the reach
of Title VI beyond the offending program in response to
Grove City. However, neither HHS nor the Department of
Education amended the applicable regulations to make
them coextensive with the expanded scope of the Civil

_____

2. Here, there is nothing to demonstrate that practices of the Fund (the
direct recipient of Title VI funds) affect the broader practices of the
NCAA.

24

Rights Restoration Act. Consequently, regulations that were initially designed to lengthen the reach of a statutory prohibition against discrimination by extending it to unintended discriminatory consequences ("disparate impact") now appear to have a shorter reach than the statutory prohibition the regulations were supposed to expand.

My colleagues address the apparent tension between the Civil Rights Restoration Act and the regulations as follows:

> We realize, of course, that arguably the Civil Rights Restoration Act implicitly expanded the scope of the "program" within 45 C.F.R. 21 80.13 and 34 C.F.R. S 100.13 so that it is not limited to a specific activity; after all, without such expansion there would be no regulations dealing with disparate treatment by reason of race, color, or national origin beyond the program actually receiving Federal financial assistance. We, however, will not address that possibility here beyond pointing it out, as this case does not involve any allegation of disparate treatment. Consequently, we have no reason to consider whether the regulations under section 602 could be applied in disparate treatment cases on an institution-wide basis.

Maj. Op. at 16-17 (emphasis in original).

It may be that this regulatory anomaly is more the result of administrative inertia than studied decision making. However, the agencies ought not to assume that their regulations have been implicitly amended by the subsequent legislation. If our analysis of the explicit language of these regulations is not what the agencies intend, I would hope that they take steps to promulgate amendments to their regulations that will clearly reflect the intended scope of the meaning of "program" as that term relates to Title VI, and similar prohibitions of discrimination.

Of course, this does not end the inquiry. As the majority notes, we must still determine "whether the NCAA is a recipient of Federal funds by reason of what the plaintiffs call its `controlling authority' over programs or activities receiving Federal financial assistance." Maj. Op. at 17. It is

25

at this point that I part company with my colleagues as I believe that the NCAA may well be subject to Title VI because it may be a controlling authority, or because the Fund may be its alter ego. Although the Supreme Court held in NCAA v. Smith, ___ U.S. ___, 119 S.Ct. 924, 926 (1999), that dues payments to the NCAA from its member institutions, who are themselves recipients of Federal financial assistance, are not sufficient to subject the NCAA to Title IX, the Court refused to reject either of these two alternative theories as a bases of recovery under Title IX. Rather, the Court stated that it would not decide the question of whether the NCAA "directly and indirectly receives federal financial assistance" because of its relationship to the Fund, and the question of whether "when a recipient cedes controlling authority over a federally funded program to another entity, the controlling entity is covered by Title IX regardless [of] whether it is itself a recipient" because neither question was decided by the lower courts. Id. at 930. Thus, the Court left "resolution of those grounds to the courts below on remand." Id. at 926. Those questions, albeit with regard to Title VI and not Title IX, are squarely before us now, and I do not believe that either proposition can be rejected as a matter of law.

II. The NCAA as a Controlling Authority.

As noted above, the NCAA is not subject to Title VI merely because it receives dues from member institutions who are themselves recipients of Federal assistance. Smith, ___ U. S. at ___, 119 S.Ct. at 926. The Federal funds going to the NCAA member institutions are not earmarked for NCAA dues, and therefore, although the NCAA is a beneficiary of those funds it is not a "recipient." See United States Dep't of Transp. v. Paralyzed Veterans of America, 477 U.S. 597, 605–07 (1986).

Thus, plaintiffs' "controlling authority argument can be sustained, if at all, only on some basis beyond the NCAA's mere receipt of dues." Maj. Op. at 17. For purposes of our discussion, there are two entities over which the NCAA may have controlling authority -- the NCAA's member institutions, and the Fund. I will first explain why I believe the plaintiffs have demonstrated that the NCAA may have

26

controlling authority over its members, and then discuss the NCAA's relationship to the Fund.

A. The NCAA's Control of Member Institutions.

1. The NCAA Constitution

The constitution of the NCAA provides in part: "The control and responsibility for the conduct of intercollegiate athletics shall be exercised by the [member] institution itself." NCAA Const., Art, 6, Rule 6.01.1. Atfirst blush, this suggests that member institutions have not ceded controlling authority over intercollegiate sports to the NCAA because constituent colleges and universities retain responsibility for, and control of, their intercollegiate athletics.

However, the constitution also provides that one of the purposes of the NCAA is: "To uphold the principle of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and the bylaws of the Association." NCAA Const., Art. I, Rule 1.2(b) (emphasis added). The NCAA's constitution also states: "It is the responsibility of each member institution to control its intercollegiate athletics program in compliance with the rules and regulations of the Association. NCAA Const., Art. 2, Rule 2.1.1 (emphasis added). These two rules appear to be in tension with Rule 6.01.1 and appear to trump whatever authority member institutions might otherwise have under the NCAA's constitution to retain control over their intercollegiate athletic programs. Consequently, I believe the plaintiffs here may be correct in their contention that the NCAA's constitution requires NCAA members to effectively cede authority over their intercollegiate athletic programs to the NCAA. Moreover, plaintiffs' position is clearly supported by the very precedent that my colleagues rely upon in granting summary judgment to the NCAA.

2. NCAA v. Tarkanian.

The majority relies heavily upon the Supreme Court's decision in NCAA v. Tarkanian, 488 U. S. 179 (1988), to

27

support its conclusion that the NCAA is not a controlling authority of the member institutions. However, Tarkanian proves just the opposite. Tarkanian illustrates the extent of absolute control the NCAA has over its member colleges and universities for purposes of our analysis, and the case establishes that the NCAA may well be a controlling authority to the extent that it should be subject to Title VI.

Tarkanian involved a dispute between UNLV and its basketball coach, Jerry Tarkanian. The Supreme Court began its analysis of the issues in that case with "a description of the relationship among the three parties –– Tarkanian, UNLV, and the NCAA." 488 U.S. at 182. Tarkanian had been hired as UNLV's basketball coach in 1973. He "inherited a team with a mediocre 14-14 record." Id. at 180. However, "[f]our years [after Tarkanian became coach] the team won 29 out of 32 games and placed third in the championship tournament sponsored by the National Collegiate Athletic Association." Id. [4] In return, the university compensated Tarkanian at a level that reflected both his value to the university, and the university's appreciation of his having transformed its basketball team into a national powerhouse. He "was initially employed on a year-to-year basis but became a tenured professor in 1977." Id. at 182. As a tenured professor Tarkanian would have received an annual salary of $53,000. However, as head basketball coach his compensation was

> $125,000, plus 10% of the net proceeds received by UNLV for participation in NCAA-authorized championship games, plus fees from basketball camps and clinics, product endorsements, and income realized from writing a newspaper column, speaking on

---

4. The importance of the NCAA's Basketball tournament –– popularly referred to as "March Madness" –– is evidenced by the fact that a major television network recently paid $6 billion for the rights to broadcast the
tournament for the next eleven years. See CBS Signs $6 Billion Deal With NCAA, Wall St. J. Nov 19, 1999, at A3 ("To keep the tournament CBS had to withstand strong competition from Walt Disney Co., which wanted the tournament for its ABC and ESPN Networks and News Corp.'s Fox network and its sports cable outlets. . . . with the internet and new-media rights as part of the deal, some industry observers wondered if CBS didn't get a bargain.") (emphasis added).

a radio program entitled `THE JERRY TARKANIAN SHOW,' and appearing on a television program bearing the same name. That compensation was entirely contingent on [Tarkanian's] continued status as the Head Basketball Coach at UNLV.

Id. at 182, n.1 (internal quotation marks omitted). Despite Tarkanian's success, and the university's appreciation of it, in September of 1977, the university informed Tarkanian that he was going to be suspended.

No dissatisfaction with Tarkanian, once described as the winningest active basketball coach, motivated his suspension. Rather, the impetus was a report by the NCAA detailing 38 violations of NCAA rules by UNLV personnel, including 10 involving Tarkanian. The NCAA had placed the university's basketball team on probation for two years and ordered UNLV to show cause why the NCAA should not impose further penalties unless UNLV severed all ties during the probation between its intercollegiate athletic program and Tarkanian.

Id. at 180-81 (emphasis added). NCAA rules did not allow it to directly sanction Tarkanian for his role in the purported rules violations. Accordingly, the NCAA had "proposed a series of sanctions against UNLV including a 2-year period of probation during which its basketball team could not participate in postseason games or appear on television." Id. at 186. However, the NCAA also required the University "to show cause why additional penalties should not be imposed against UNLV if it failed to discipline Tarkanian by removing him completely from the University's intercollegiate athletic program during the probation period." Id. at 187.

In response, the president of the University directed the vice president to conduct a hearing to determine what the University should do. "Tarkanian and UNLV were represented at the hearing; the NCAA was not." Id. at 186. Following that hearing, the vice president of the University "expressed doubt concerning the sufficiency of the evidence supporting the [NCAA's] findings." Id . Nevertheless, "he concluded that `given the terms of our adherence to the

29

NCAA we cannot substitute -- biased as we must be -- our own judgment on the credibility of witnesses for that of the infractions committee and the Council [of the NCAA]." Id. at 186-7 (emphasis added). He advised the University's president that the NCAA's ultimatum that the University sever all ties to its intercollegiate athletic program and Tarkanian "or else," left the University with but three alternatives. The University could

> 1. Reject the sanction requiring [disassociatio n] from Coach Tarkanian from the athletic program and take the risk of still heavier sanctions, e.g., possible extra years of probation.

> 2. Recognize the University's delegation to the NC AA of the power to act as ultimate arbiter of these matters, thus reassigning Mr. Tarkanian from his present position--though tenured and without adequate notice-- even while believing that the NCAA was wrong.

> 3. Pull out of the NCAA completely on the grounds that [the University] will not execute what [it] hold[s] to be their unjust judgments.

109 S.Ct. at 187 (emphasis added). Faced with an offer it could not refuse, the University "accepted the second option and notified Tarkanian that he was to be `completely severed of any and all relations, formal or informal with the University's Intercollegiate athletic program during the period of the University's NCAA probation,' " Id., just as the NCAA wished. Thereafter Tarkanian filed suit under 42 U.S.C. S 1983 against the UNLV arguing that its actions had deprived him of property and liberty without due process of law. He brought a second civil rights action against the NCAA. The two suits were consolidated on appeal to the Supreme Court. The Court concluded that Tarkanian had no cause of action against the NCAA under S 1983 because the alleged deprivations did not arise from state action as required for liability under S 1983. The Court stated:

> it was UNLV, the state entity, that actually suspended Tarkanian. Thus the question is not whether UNLV participated to a critical extent in the NCAA's activities, but whether UNLV's actions in compliance with the

30

>NCAA rules and recommendations turned the NCAA's
>conduct into state action.

Id. at 193. The Court held that it did not because "the
source of the legislation adopted by the NCAA is not Nevada
but the collective membership, speaking through an
organization that is independent of any particular state." Id.
The Court noted that the NCAA might still be a state actor
if "UNLV, by embracing the NCAA's rules, transformed them
into state rules and the NCAA into a state actor." Id.
However, the Court concluded that the nexus between
UNLV and the NCAA was not sufficient to cloak the NCAA
with the state authority vested in the University.

Contrary to being an agent of the state, the NCAA had
acted in opposition to, rather than in compliance with, the
wishes of the state agency. "During the several years that
the NCAA investigated the alleged violations, the NCAA and
UNLV acted more like adversaries than like partners . . .".
Id. at 196. Here, the majority concludes that "the Supreme
Court's decision in NCAA v Tarkanian, is instructive, as
that case makes clear that the NCAA does not `control' its
members." Maj. Op. at 8. However, Tarkanian proves the
reverse. The issue there was not whether the NCAA
controlled its members, but whether a state institution that
was a member of the NCAA controlled that organization to
the point of transforming the NCAA into a state actor. My
colleagues therefore look at Tarkanian through the wrong
end of the telescope. We are not focused upon a university's
control of the NCAA. Rather, we must focus upon the
NCAA's control of the colleges and universities that
comprise its membership. Tarkanian is compelling support
for the plaintiffs' argument that the NCAA does exercise
sufficient control over members' intercollegiate athletic
programs to subject it to Title VI. The fact that UNLV was
coerced into accepting the only viable option among the
three choices left it by the NCAA's ultimatum in that case
demonstrates just how much control the NCAA has over
member institutions' athletic programs. Although that
control may not be as great outside of Division I, the
control certainly seems pervasive insofar as those schools
that are subject to Proposition 16 are concerned.

31

Of course, I realize that the Court in Tarkanian recognized that "UNLV could have retained its coach and risked additional sanctions, perhaps even expulsion from the NCAA, or it could have withdrawn voluntarily from the Association," Id. It should come as no great surprise that it did neither. That is consistent with the Court's conclusion that the NCAA was not a state actor. However, it is also consistent with, and I think illustrative of, the NCAA's near total control of its members insofar as the amenities that are tethered to Division I athletic dominance in a "money sport" like college basketball. UNLV knew it had an alternative to suspending Tarkanian. The University clearly did not want to suspend him. The University thought that doing so was unjust and unjustifiable. Yet, Tarkanian was suspended just as the NCAA had commanded. The Supreme Court expressed skepticism over whether those circumstances established the NCAA's state authority, but the Court clearly entertained the possibility that those circumstances established the NCAA's control of UNLV's athletic program.

> Tarkanian argues that the power of the NCAA is so great that the UNLV had no practical alternative to compliance with its demands. We are not at all sure this is true, but even if we assume that a private monopolist can impose its will on a state agency by a threatened refusal to deal with it, it does not follow that such a private party is therefore acting under color of state law.

> In the final analysis the question is whether the conduct allegedly causing the deprivation of a federal right [can] be fairly attributable to the State. It would be ironic indeed to conclude that the NCAA's imposition of sanctions against UNLV -- sanctions that UNLV and its counsel including the Attorney General of Nevada, steadfastly opposed during protracted adversary proceedings -- is fairly attributable to the State of Nevada. It would be more appropriate to conclude that UNLV has conducted its athletic program under color of the policies adopted by the NCAA, rather than that those policies were developed and enforced under color of Nevada law.

32

Id. at 199. (emphasis added).

Therefore, I believe a fact finder could reasonably conclude that the member institutions have ceded control over their intercollegiate programs to the NCAA, and this could subject the organization to Title VI. However, even if the NCAA is not a controlling authority, I think a reasonable inference could be drawn that the Fund is the alter ego of the NCAA, and therefore the latter is actually a recipient of Federal assistance under Title VI.

B. The NCAA's Control Over the Fund

It is undisputed that the NCAA created the Fund in an attempt to insulate itself from being considered a recipient of Federal assistance. Frank Marshall, the NCAA's Group Executive Director for Finance and Business Services and the Secretary/Treasurer of the Fund, testified at his deposition as follows:

> Over time the NCAA has wanted to insure that it is not a recipient or a contractor of the federal government and has tried to manage the NYSP program in accordance with that. The NYSP Fund I believe was created to be the grant recipient related to the NYSP grant to help insure that distinction.

App. at 147a.

That motivation is not, by itself, a justification for viewing the NCAA and the Fund as a single entity. However, I think that a genuine question remains as to whether the Fund has an existence separate and apart from the NCAA.

1. Arguments in favor of the Fund as alter ego

Plaintiffs argue the following to support their claim that the Fund has no separate existence and is, therefore, the alter ego of the NCAA:

– Pursuant to the Funds' byla ws, the Funds' Board of Directors is composed solely of high-level NCAA employees and the chair of the NCAA's NYSP Committee.

33

– All of the decisions regard ing the NYSP Fund's operations and use of federal funds are made by the NCAA's NYSP Committee.

– The NCAA's NYSP Committee h as final approval over which colleges and universities may participate in the NYSP as subgrantees and over which schools may continue to participate in the program.

– The NCAA performs all of th e NYSP's administrative services, pursuant to a contract, for annual consideration of one dollar.

– The administrative services  include handling the receipt and the disbursement of the federal grant money through a bank account that bears the name, "The National Collegiate Athletic Association –- The National Youth Sports Program."

– Upon dissolution of the Fun d, all of the Funds' assets are to be transferred to the NCAA.

– The Fund does not observe s tandard corporate formalities. It has no offices, no employees and no letterhead. It has never had a Board of Directors meeting nor has the Fund performed anything other than ministerial functions since its inception.

– In 1993, the NCAA prepared and submitted form guidelines to HHS on the Fund's behalf, which identified the NCAA and not the Fund as the grantee. The guidelines specified that the NCAA was responsible for the program's direction and control.

– Four years after the Fund b ecame the named grantee, HHS issued a press release identifying the NCAA as recipient of the annual grant to operate the NYSP.

– In 1994, The Department of Health and Human Service's Office of Civil Rights investigated allegations that the NCAA engaged in discrimination in violation of Title IX based on HHS' determination that the NCAA was the recipient of federal funds.

2. Arguments Against Viewing the Fund
        as an Alter Ego.

The NCAA disagrees. It argues that it successfully created the Fund as a separate entity, and that there was nothing wrong with doing so. In support of its assertion that the Fund is a separate entity the NCAA submits:

– All of the federal funds re ceived by the Fund are sub-granted to third parties, and none have ever been diverted to or for the benefit of the NCAA.

– Since its creation, the NYS P Fund has remained separate and distinct from the NCAA and the Fund's separate and distinct character is evidenced by the fact that the Fund contracts with third parties for services, maintains its own insurance5 and Federal Employee Identification Number ("E.I.N."), and has been sued in its own name. In addition, the Fund's fiscal year runs from June 1 through May 31, while the NCAA's fiscal year runs from September 1 through August 31.

– The Fund pays individuals t o perform evaluations of the program.

– The NCAA only provides free  administrative services to the Fund pursuant to a written contract.

– Although the NYSP Committee  was created by the NCAA and although the NYSP Committee makes final determinations with respect to the disposition of funds, the NYSP Committee is not controlled by the NCAA. According to the NCAA, the NYSP Committee has no NCAA employees. Rather, it is composed of representatives from five participating NYSP institutions and three ex-officio members, including two representatives from the federal government.

_____

5. This assertion is not entirely true. Although the Fund has been the named recipient of federal funds since 1992, the named insured on the insurance policies has not always been the Fund. From June 1, 1992 to June 1, 1994, the named insured was "National Collegiate Athletic Association d/b/a National Youth Sports Program." It is only from June 1, 1994, that the named insured has been "National Youth Sports Program Fund."

— In 1989, the Department of Education's Office of Civil Rights declined to investigate an allegation that Proposition 48 discriminated against students with learning disabilities in violation of S 504 of the Rehabilitation Act of 1973 based on its determination that the NCAA was not a recipient of federal funds.

3. More Than One Inference Can Be Drawn From
        Undisputed Facts.

Of course, this matter is before us on appeal from the District Court's grant of summary judgment. The parties did agree at oral argument that there are no genuine issues of disputed material fact. Nevertheless, unlike my colleagues, I do not think that the purported absence of disputed facts necessarily warrants a grant of summary judgment because the undisputed facts allow for more than one interpretation of the relationship of the Fund to the NCAA. Thus, I believe that summary judgment to either party is inappropriate. See Nathanson v. Medical College of Pennsylvania, 926 F.2d 1368, 1380 (3d Cir. 1991) ("Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed.").

The conflict between Rule 6.01.1, on the one hand, and Rules 1.2(b) and 2.1.1, on the other hand viewed in context with the realities of the importance of NCAA membership to Division I schools places the issue of the NCAA's control of member institutions into a posture that can only be resolved by a trier of fact. Similarly, issues remain as to whether the Fund is an alter ego of the NCAA. For example, both parties here rely on the undisputed fact that the NCAA provides administrative services to the Fund for a nominal yearly fee as support for their completely opposite conclusions. Similarly, it is undisputed that the Fund's Board of Directors is composed of high-level NCAA employees, that the NYSP Committee is a NCAA committee, and that the NYSP Committee makes final determinations with respect to the disposition of the HHS grant. However, it is also undisputed that no NCAA employees are members of the NYSP Committee. Rather, the NYSP Committee is comprised of representatives from five participating NYSP

36

institutions and three ex-officio members, including two representatives from the federal government. I believe that more than one conclusion can reasonably be drawn from the undisputed facts. Consequently, I believe that the matter should be remanded for trial.

III. Limitations Imposed Under The Spending Clause

If the NCAA is found to be a controlling authority of its members, the NCAA may still not be subject to Title VI. As the majority correctly notes, Title VI is Spending Clause legislation. Maj. Op. at 20. Title VI's character as a "typical `contractual' spending power provision," Guardians Ass'n v. Civil Service Comm'n, 463 U. S. 582, 599 (1985), raises a crucial question that was not addressed by the District Court. The majority claims that there is "no contractual privity between the Departments of Health and Human Services and Education and the NCAA with respect to Federal financial assistance to NCAA members." Maj. Op. at 20. However, I do not think we can jump to that conclusion without a proper privity analysis, and the District Court never conducted one. Moreover, if a fact finder concludes that the Fund is merely an alter ego of the NCAA, the privity hurdle may be cleared.6 Similarly, if member institutions have ceded control of their programs to the NCAA, one could logically conclude that Congress intended to include the NCAA (as the authority actually controlling the programs receiving the Federal assistance) within the

_____

6. Under the traditional application of the alter ego doctrine, corporate form may be disregarded when the corporation is "the mere instrumentality or business conduit of another corporation or person." 1 FLETCHER CYCLOPEDIA OF PRIVATE CORP. S 41.10(perm. ed. rev. vol. 1999).

"The effect of applying the alter ego doctrine . . . is that the corporation
and the person who dominates it are treated as one person, so that any act committed by one is attributed to both, and if either is bound, by contract, judgment or otherwise, both are equally bound. . . ." Dudley v. Smith, 504 F.2d 979, 982 (5th Cir. 1974) (citation omitted) (emphasis added). Thus, I believe it is an open question as to whether the program-specific limitation of the regulations can reach the NCAA if the Fund is truly its alter ego and was established solely to provide interference for an end run around Title VI. See Maj. Op. at 17.

37

contractual obligations required of a grantee under Title VI.7 I do not think that Congress intended to enter into contractual obligations with colleges and universities in return for giving Federal assistance, and then allow those same institutions to keep the assistance while evading their contractual obligations by turning control of their intercollegiate athletics over to a purported insulated third party.

I agree that Spending Clause jurisprudence dictates that we should be "circumspect in imposing Title VI obligations on an entity which is not a direct recipient of Federal financial assistance." Maj. Op. at 20. However, that does not preclude our requiring the District Court to undertake a privity analysis after resolution of the competing inferences arising from the undisputed facts to determine whether the NCAA's own conduct or structure subjects it the restrictions of Title VI. Moreover, if the Fund is merely the alter ego of the NCAA the latter may be the recipient, and we ought not treat the Fund as a separate entity. Accordingly, I conclude that the only appropriate course here is to reverse the District Court's grant of summary judgment, and remand the matter for trial.

IV. CONCLUSION

For the foregoing reasons, I respectfully dissent from the majority opinion and would, instead, remand for resolution of the competing inferences that can arise from the undisputed facts. Once the inferences are drawn, a proper analysis of the NCAA's privity of contract under the Spending Clause can proceed.

_____

7. In Paralyzed Veterans of Am, when considering the application of the Spending Clause to the limitations imposed upon recipients of Federal assistance under S 504 of the Rehabilitation Act, the Supreme Court stated: "[b]y limiting coverage to recipients, Congress imposes the obligations of S 504 upon those who are in a position to accept or reject those obligations as a part of the decision whether or not to `receive' federal funds." Id. at 606.

A True Copy:
Teste:

    Clerk of the United States Court of Appeals
    for the Third Circuit