Luis **CRUZ,** by his parent and natural guardian, Ramonita **CRUZ,** and Ridley School District, Plaintiffs,

v.

**PENNSYLVANIA INTERSCHOLAS-TIC ATHLETIC ASSOCIATION, INC.,** Defendant.

No. CIV. A. 00–5594.

United States District Court, E.D. Pennsylvania.

June 27, 2001.

Arthur Levy, Media, PA, for plaintiffs.

Jeffrey F. Champagne, Penna. Dept. of Education, Chief Counsel, Alan R. Boynton, Jeffrey F. Champagne, McNess, Wallace & Nurick, Harrisburg, PA, for defendant.

## MEMORANDUM

BUCKWALTER, District Judge.

By stipulation, the parties agreed that the evidence in the case now before the Court would consist of: the testimony provided on November 15, 2000; the exhibits proffered during that hearing (including any exhibits that were marked for identification, shared with opposing counsel, and used in the course of the November 15, 2000 testimonial hearing but that may not have yet been formally accepted into evidence); and, at the option of the defendant, the Individualized Education Program for Luis Cruz as it existed in June 2000 and as provided by plaintiffs to defendant by letter dated November 29, 2000.

The parties also encouraged the Court to include in its consideration of the merits the briefs that they submitted prior to the November 15, 2000 preliminary injunction hearing. Plaintiff has objected only to certain exhibits attached to the pre-hearing brief of defendant. Those exhibits are not admitted into the evidence of this case except for the two Individualized Edu-

cation Programs (IEP's) and one Comprehensive Evaluation Report (CER) for Luis Cruz, the plaintiff in this case.

## I. FINDINGS OF FACT

### A. Identity of Parties

1. A Plaintiff herein is Luis Cruz, by and through his mother and natural guardian, Ramonita Cruz, both of whom are individuals residing at 120 Crosby Street, Chester, Delaware County, Pennsylvania 19013.

2. A Plaintiff herein is Ridley School District, a school district and political subdivision of the Commonwealth of Pennsylvania, having a principal address at 1001 Morton Avenue, Folsom, Delaware County, Pennsylvania 19033.

3. Defendant herein is the Pennsylvania Interscholastic Athletic Association, Inc. ("P.I.A.A."), a Pennsylvania association having a principal address at 550 Gettysburg Road, P.O. Box 2008, Mechanicsburg, Pennsylvania 17055–0708.

### B. Stipulation

A Joint Stipulation of Facts by the parties follows:

1. P.I.A.A. is a Pennsylvania non-profit membership corporation composed of most public and many private high schools in Pennsylvania, for a total of approximately 1,350 schools.

2. A purpose of P.I.A.A. is to develop and apply rules regulating interscholastic athletic competition among its members. Article II of the P.I.A.A. Constitution states that the purpose of the P.I.A.A. is to "formulate and maintain policies that will safeguard the educational values of interscholastic athletics and cultivate high ideals of good sportsmanship."

3. The Preamble to the P.I.A.A. Constitution contains an Equal Opportunity Statement that the P.I.A.A. "believes that all boys and girls should have equal opportunity to participate in all levels of interscholastic athletics regardless of race, color, sex, creed, religion or ethnic background."

4. P.I.A.A. is governed by a Constitution adopted by its member schools and By–Laws adopted by its elected Board of Directors. The authenticity and admission into evidence of the written P.I.A.A. Constitution and By–Laws with the period 2000–2001, as well as the P.I.A.A.'s written Policy and Procedures, is stipulated.

5. P.I.A.A. is divided, for administrative purposes, into eleven geographic districts. Member schools elect a district committee.

6. Ridley High School is a P.I.A.A. member in District I, which encompasses Bucks, Chester, Delaware, Montgomery and Philadelphia Counties.

7. Each district committee elects a chairman who becomes the district's representative on the Board of Directors, which is the statewide governing body of the organization.

8. The other members of the Board of Directors include representatives of the Pennsylvania Association of Secondary School Principals, the Pennsylvania State Athletic Directors Association, the Pennsylvania School Boards Association, athletic officials, and junior high/middle schools. In addition, the Board of Directors has advisors from the Pennsylvania Department of Education, the Pennsylvania Association of School Administrators (Superintendents), the Chairman of the Girls' Athletics Steering Committee, and a representative of the private schools which are members of P.I.A.A.

9. All of the members of the Board of Directors are experienced professional educators who also have background and experience in dealing with high school athletics.

10. The Preamble to the P.I.A.A. Constitution, entitled "Adherence to and enforcement of P.I.A.A. Rules," states that a District Committee or the Board of Directors of the P.I.A.A. may on its own motion enforce P.I.A.A. requirements. Under Article VII, Section 1 thereof, the Board of Directors of P.I.A.A. directors shall, among other things, (1) have general control over all interscholastic athletic relations and athletic contests in which a P.I.A.A. member school participates (Subsection A); hear appeals from decision of District Committees and make the necessary investigations and decisions (Subsection G); (2) fix and enforce penalties for any violation of the P.I.A.A. Constitution By–Laws (Subsection H); and (3) have general control of championship contests and interscholastic meets (Subsection I).

11. Section 1 of Article I of the By–Laws is commonly called the Age Rule. It provides as follows:

## ARTICLE I

## AGE

**Section 1. Maximum Age Rule.**

A pupil shall be ineligible for interscholastic athletic competition upon attaining the age of nineteen years, with the following exception:

If the age of 19 is attained on or after July 1, the pupil shall be eligible, agewise, to compete through that school year.

12. Section 3 of Article XII of the By–Laws is commonly called the Forfeiture Rule. It provides as follows:

## ARTICLE XII

## PENALTIES

**Section 3. Forfeit of Games.**

(a) A school shall be required to forfeit a contest for using an ineligible coach and/or contestant.

13. The purposes of Article I of the P.I.A.A. By–Laws as asserted by the P.I.A.A. are: (1) to protect high school athletes of customary age from the dangers and unfairness of participation with those who are older and thus perhaps physically larger, stronger, and more mature and experienced; (2) to limit the possibility that the team with the over-age student will gain an unfair competitive advantage over opponents; (3) to have available the maximum number of team positions for high school athletes who are of customary age for students in high school; and (4) to maintain uniformity of standards with regard to the age of participants.

14. The P.I.A.A. By–Laws are subject to amendment through P.I.A.A.'s legislative process.

15. Ridley High School, which is part of Ridley School District, is a recipient of federal funding.

16. Luis Cruz is a learning disabled, special education student in his fourth year at Ridley High School.

17. Luis Cruz has played several sports in his first three years at Ridley High School, including football, wrestling and track.

18. Because he is a student with a disability, Luis Cruz is educated in accordance with an individualized education program (IEP), pursuant to the Federal Individuals with Disabilities Education Act (IDEA).

19. As a "non-graded" student, Luis Cruz is not enrolled in a particular numerical grade.

20. Under the IDEA, Luis Cruz has a right to a free and appropriate education and to attend high school until the end of June 2002, when he will be 21 years old, or

until he graduates in a manner consistent with the IDEA if he does so before age 21.

21. The authenticity and admission into evidence of Luis Cruz's written records previously exchanged between the parties and presented at trial, including IEP's dated June 22, 2000, April 29, 1999 and May 1, 1998, and his Comprehensive Evaluation Reports (CER) dated June 7, 2000 and May 11, 1998, is stipulated.

22. Most students enter high school at age 13 or 14 and graduate after four years at age 17 or 18. Said students are eligible under P.I.A.A. rules to participate in interscholastic high school sports for four years provided that such students meet the eligibility rules of P.I.A.A.

23. Students who are age 13, 14, 15, 16, 17 and 18 participate in interscholastic high school sports and P.I.A.A. sanctioned events, and are not ineligible due to age according to P.I.A.A. rules.

24. Luis Cruz turned 19 years of age on June 2, 2000, prior to his fourth year at Ridley High School.

25. Luis Cruz subsequently played in two interscholastic football games during the 2000 football season.

26. Ridley High School officials then realized the conflict with the Age Rule, in that Luis Cruz's birthday fell 28 days before July 1, 2000, and promptly thereafter reported the same to the P.I.A.A.

27. Ridley High School and Ridley School District requested the P.I.A.A. grant a waiver/exemption as to said rules and/or amend the rules.

28. At its meeting of Saturday, October 7, 2000, the P.I.A.A. Board of Directors considered Ridley's request to amend the Age Rule to provide for a waiver. The request was unanimously rejected on October 7; that result was communicated by P.I.A.A. to Ridley no later than the next school day and was communicated in writing by letter dated October 13, 2000.

## C. Additional Facts

1. Despite his residence, Luis Cruz attends Ridley High School under a consortium program for special education students, and Ridley School District is responsible for his school programming.

2. Shortly after receiving notice of the Board's decision, plaintiffs filed a Complaint and Petition for Preliminary Injunction with this Court. A hearing on the request to enjoin defendant preliminarily from enforcing the Age and Forfeiture Rules against Luis Cruz and Ridley School District was held before the undersigned on November 15, 2000.

3. Following the hearing, this Court held that plaintiffs had not met the burden of proof for preliminary injunction purposes of showing immediate, irreparable harm. The bench ruling was followed by the undersigned's Memorandum and Order dated November 20, 2000.

4. The parties thereafter stipulated, and this Court approved by Order dated December 15, 2000, a process whereby plaintiffs' request for permanent injunction was to be decided by the Court on the record made at the November 15, 2000 hearing, and upon receipt from the parties of proposed findings of fact and conclusions of law.

5. It was reiterated at the hearing that Luis Cruz is a 19–year old public school special education student who is educable mentally retarded. He is currently in his fourth year at Ridley High School.

6. Because he is a student with a disability, CER's and IEP's have been prepared for Luis Cruz throughout his period of enrollment in the Ridley School District, pursuant to IDEA. Mr. Cruz has a cur-

rent CER and is currently being educated in accordance with an IEP.

7. Luis Cruz's window of opportunity to participate in high school instruction and sports at an earlier age was limited and he did not have comparable opportunities as non-special education children, since due to his intellectual limitations he entered elementary school between ages eleven and twelve, rather than at the customary younger age, and then stayed an additional two years over the regular education students. (N.T. 16). At age 13, he entered Ridley Middle School and after three years, went to Ridley High School. Luis is now assigned to a full-time learning support program. He has been a special education student throughout middle school and high school. He presently reads on a third-grade level.

8. Pursuant to State and Federal mandates, Luis has a written individualized education program (IEP). The authenticity and admission into evidence of Luis Cruz's written records previously exchanged between the parties and presented at trial, including his IEP's dated June 22, 2000, April 29, 1999 and May 1, 1998, and Luis Cruz's comprehensive evaluation report (CER) dated June 7, 2000 and May 11, 1998, is stipulated.

9. Luis Cruz's IEP dated May 1, 1998 provides in pertinent part, "Luis experienced a very successful freshman year at Ridley High School. He did quite well within the self contained program, academically and socially. He also participated in three different extracurricular sports teams." His IEP dated April 29, 1999 provides in relevant part "Luis enjoys many types of sports. He is currently involved in organized sports at the high school." Luis Cruz's CER dated June 7, 2000 provides in relevant part, "Luis is also a part of the Athletic department at the High School. He is a member of the

football and wrestling teams in the fall and the track team in the Spring. The coaches are very happy with his performances."

10. The last IEP for Mr. Cruz dated April 29, 1999, and which was in effect before he became age-ineligible under the Age Rule, does not mention a need for extracurricular activities including sports. The IEP notes as follows:

> b) Recreation Leisure: Luis enjoys many types of sports. He is currently involved in organized sports at the high school. He enjoys going to the mall with his friends and also helping to clean and cook at home. He likes to read in his spare time.

Sports is not mentioned elsewhere in this 1999 IEP.

11. Luis Cruz's IEP of June 22, 2000 specifically provided, under Desired Post–School Outcomes, among other things, that "Luis has become friends with many of the team players and is often socializing with them in the hallways during the school day. Luis continues to recquire [sic] extra-curricula activities, such as sports, as part of his need for socialization and educational outcomes." This was subsequently amended to provide that "Luis has become friends with many of the team players and is often socializing with them in the hallways during the school day. Luis continues to require extra-curricula activities, such as sports, as part of his need for socialization and educational outcomes *provided in accordance with IDEA regulations.*"

12. The list of needs in Luis Cruz's CER of June 22, 2000 does not include matters relating to motivation, attentiveness to work, social skills, physical coordination or self-esteem. Rather, his CER lists four needs: consumer math, functional reading, problem solving and employability skills.

13. The plaintiffs have not contested the adequacy of Mr. Cruz's IEP or criticized the level of specificity in the IEP.

14. Luis Cruz has participated in interscholastic sports in all three of his first three years at Ridley High School, including football, wrestling and track.

15. Kim Woods, Director of Special Education Services for Ridley School District, testified on behalf of plaintiffs. She testified that Luis Cruz's IEP has been completely complied with except with regard to the athletic aspect of it, which is now violated by the P.I.A.A.'s Age–Rule.

16. Ms. Woods testified that the desired post-school outcomes in Luis Cruz's IEP's are supported by Luis Cruz's sports participation. She stated that the interscholastic sport activities enable Luis Cruz to interact with regular peers and adults, familiarize him with demands and responsibilities, importantly permit him to develop interpersonal skills which will help him maintain a job after high school, enable him to learn how to interact and converse, and are absolutely important to his self-esteem and self-confidence.

17. Ms. Woods testified that it is important to continue and maintain all of these areas, which represent critical skills, particularly for Luis Cruz. She noted that sports participation was always mentioned in Luis Cruz's IEP's, which shows need for the same and should be followed. Ms. Woods stated that while Luis Cruz was achieving positive outcomes throughout high school, he was at all times participating in interscholastic sports. Ms. Woods said that Luis Cruz's participation assisted him developing self-esteem, motivation, maturity and other objectives.

18. Ms. Woods further testified that Luis Cruz's participation as part of a team unit was important, and that this cannot be fully achieved by merely practicing with a team, but should be seen through to fruition and completion of a project by participating in contests.

19. Paula Krissinger, special education teacher in Ridley School District, also testified on behalf of plaintiffs. She confirmed that Luis Cruz has been a member of various high school sports teams for the three years he has been at Ridley High School. She stated that Luis Cruz's participation on the football, wrestling and track teams have greatly enhanced his overall high school experience. Ms. Krissinger testified that sports have always been important to Luis Cruz in particular, and that she knows of no other learning disabled students participating in Ridley sports programs.

20. Ralph Batty, teacher and head football coach at Ridley High School, also testified on behalf of plaintiffs. He stated that it was important for Luis Cruz actually to participate in games, if possible, as part of a team, rather than being absolutely limited to practice. Mr. Batty testified that he knew Luis Cruz from the ninth grade, when he actually scored a touchdown in a football game and hugged the official as he was raising his arms. Luis Cruz is a good kid, a hard worker, an inspiration to others. He has come from difficult circumstances and achieves.

21. Carl Schnellenbach, retired teacher and current head coach of the wrestling team at Ridley High School, also testified on behalf of plaintiffs. He confirmed that "I've been around a long time and he's the hardest worker, most motivated, dedicated kid that I know." Mr. Schnellenbach said that Luis Cruz's wrestling participation has improved his social skills, and that the wrestling program could provide him with a post-education opportunity at Williamson College, a trade school. He said that Luis Cruz has been beaten at wrestling by juniors, and that parents of other students

have stated that they want Luis Cruz to wrestle on the team, even if he defeats other students. Mr. Schnellenbach testified that Luis Cruz would be the same wrestler "if he was born June 1, June 2 or May 31."

22. Pete Riviello, Director of Athletics for Ridley School District, also testified on behalf of plaintiffs. He stated that Luis Cruz has tried out for the baseball team in the past, but that team has a cut policy, and Luis Cruz did not make the team. Mr. Riviello testified that Luis Cruz did participate on the interscholastic track teams during Spring semesters. He confirmed what was previously said, including that Luis Cruz has no competitive advantage, is not a safety risk, does not displace other players (due to a no-cut policy), and is a positive influence.

23. Mr. Riviello also testified that, despite P.I.A.A. rules as to certifying eligibility of players, none of the 10 schools that comprise the Central League abide by that rule. There was no testimony that P.I.A.A. enforced those rules. The technical ineligibility of Luis Cruz—a discrepancy in this case of 28 days—only was revealed because Ridley School District itself reported it as soon as it was discovered.

24. Mr. Riviello testified that there were no intramural alternatives to the Ridley High School interscholastic track and wrestling teams, and that there is a flag football intramural unit which is not even close to being a comparable alternative to the varsity football team of which Luis Cruz has been a member.

25. Mr. Riviello also noted that the P.I.A.A. rules permit students to participate in eight semesters of interscholastic sports; however, Luis Cruz has only been permitted to participate in six semesters, and he still needs the remaining two semesters.

26. Bradley Cashman, Executive Director of the P.I.A.A., testified on behalf of Defendant as to the P.I.A.A. organization and the motivations behind the Age Rule; namely, to avoid competitive advantage, safety risk and displacement of customary-age players. Mr. Cashman opined that the Age Rule does not prevent a student from practicing, but does prevent him or her from participating in scholastic athletic contests.

27. Mr. Cashman testified that as of December 1, 1998 there were 2,413 special education students in Pennsylvania who were 19 years old. Mr. Cashman testified he does not know how many of these students participate in interscholastic competition. He testified he did not know how many of these students have an IEP providing for sports activities. He said that as of December 1, 1998 there were 308 21-year old special education students in Pennsylvania.

28. Mr. Cashman did not state how many of the 19-year old students in Pennsylvania were ineligible under the Age Rule. He confirmed that 19-year old students are not ineligible if they are born after the July 1 cut-off date, and that 19-year old students may be competing against 14-year olds.

29. Mr. Cashman stated that the P.I.A.A. has averaged about 2 to 3 requests to amend the Age Rule annually during the past 20 years. He stated that Luis Cruz's case is at most the second time, he believes, that the P.I.A.A. has received a request in the context of a student with an IEP.

30. Mr. Cashman testified that other ineligibility rules of the P.I.A.A., such as the 8-semester rule and the transfer rule, have waiver provisions, but the Age Rule does not, suggesting that it would be an overly burdensome task to evaluate competitive advantage in individual cases. Mr.

Cashman acknowledged that evidentiary hearings are regularly held by the P.I.A.A. as to the transfer rule and the 8–semester rule, often determining "athletic intent."

31. Ridley's request to amend the Age Rule was accompanied by possible amendatory language that would have provided an exception to the Age Rule "if ... the pupil is not over the age of 21[and]: (1) an application for waiver is made to the P.I.A.A.; (2) the student does not create a safety risk to other players; (3) the student does not skew the overall competitiveness of the particular activity in which the student will participate; and (4) the student has an individualized education program (IEP), containing provisions for extra-curricular activities."

32. An assessment of whether the student would "skew the overall competitiveness of the particular activity" or whether the student would constitute a competitive advantage would have to be looked at not only sport by sport, but individual by individual. Such an assessment would involve examining the individual in comparison with members of his or her own team, and in comparison with members of opposing teams. Such an assessment would involve projecting future athletic performance, at a time in the student's life when athletic ability is changing. This would be a very difficult, complex, and burdensome assessment involving many variables, including both objective and subjective elements, according to Mr. Cashman.

33. P.I.A.A. does not have the power to compel the information from competitor schools that would be necessary to determine whether the student would "skew the overall competitiveness of the particular activity" or whether the student would constitute a competitive advantage.

34. P.I.A.A. estimates that it would have to significantly increase the size of its staff, doubling or tripling it, in order to perform assessments of whether a student would "skew the overall competitiveness of the particular activity" or whether the student would constitute a competitive advantage.

35. Luis Cruz is not a "star" player in any of his interscholastic sports. Luis Cruz has been included in the football program for an inclusive experience. He is a marginal player and appeared in football games on a very limited basis such as a few kickoffs where the performance apparently was not critical. At the same time, the non-special education students of Ridley High School are attempting to be inclusive. They have rallied around him, as he is a "great team player."

36. Luis Cruz is not more experienced than other players. In fact, he is less experienced and therefore has played football only on a very limited basis. Further, he is five foot three inches tall and weighs 130 pounds, which is by no means greater than the average height and weight of other, even younger, participants. It is thus readily apparent that there is no safety threat to others or competitive advantage in the situation presented here. Also, again, there is no "cut" policy on the football squad, so Luis Cruz is not replacing any other student who would otherwise have an opportunity to play.

37. Luis Cruz has "good basic skills" in wrestling, but there are "a lot of better wrestlers than him." He is not a safety risk factor, but he may have a competitive advantage based on his outstanding dual meet record.

38. In track, where there is also a no-cut policy, Luis Cruz is not a fast runner, does not displace other students, has no competitive advantage and represents no safety risk. He runs a minute behind qualifying time in the mile. He has been

unable to earn points in dual meets and would only place by default.

39. The current IEP does not mention interscholastic athletics and does not list participation in interscholastic athletic contests as either an item of special education or as a related service for Mr. Cruz

40. The current IEP for Mr. Cruz includes a description of Mr. Cruz's needs or deficits. Mr. Cruz has no known deficit in the area of self-esteem that impacts on his productivity. Ridley's special education evaluation of Mr. Cruz does not indicate that Mr. Cruz has problems in the area of self-esteem. CER's and IEP's from 1993 to the present do not indicate any deficits in the area of self-esteem.

41. Mr. Cruz has no known deficits in the areas of peer interaction or interaction with adults that affects his productivity. CER's and IEP's from 1993 to the present do not indicate any deficits in the area of social skills.

42. Mr. Cruz has no known deficits in the area of motivation. CER's and IEP's from 1993 to the present do not indicate any deficits in the area of motivation.

43. The description in Mr. Cruz's current IEP does not indicate that Mr. Cruz has a deficit in being punctual for appointments or other events. Mr. Cruz has no known deficit in the area of punctuality. CER's and IEP's from 1993 to the present do not indicate any deficits in the area of punctuality. Mr. Cruz has a recent history of good punctuality in getting to transportation to his current IEP-related job site.

44. In Luis Cruz's current IEP, the section labeled "present status" describes him as "very motivated ... eager to learn and succeed ... responsible and very dependable ... never afraid to take on more work ... always willing to help his teach-ers and peers ... has many friends in and outside of the program."

45. Mr. Cruz's IEP lists, among his strengths, that he is helpful, cooperative, eager to learn, and friendly. The list of his needs in his IEP do not include matters relating to motivation, attentiveness to work, social skills, physical coordination, or self-esteem. Rather, his IEP lists four needs: functional reading, consumer math, employability skills, and problem solving skills.

46. The goals stated in Mr. Cruz's current IEP are consistent with his stated needs. They focus on developing functional reading and problem-solving skills and acquiring an understanding of basic math required of consumers.

47. Mr. Cruz's IEP, the section on "program modifications and specially designed instruction" reads, in its entirety, as follows: "project-based learning; calculator to enhance math computation; directions given verbally and in small, sequential steps to aide in understanding; job coaching at worksites."

48. Mr. Cruz's IEP, the section on "related services" reads, in its entirety, as follows: "Transportation: will be provided by Chester/Upland School District."

49. The IEP includes information relating to the desired post-education outcome of Mr. Cruz being prepared to be employable. These are referred to as transition goals.

50. In Mr. Cruz's case, the section of the IEP that gives background for transition planning reads as follows:

**DESIRED POST–SCHOOL OUTCOMES**: Define and project the desired post-school outcomes as identified by the student, parent and IEP team for these areas: Community Living, Employment or Postsecondary Education/Training, or both.

1. Post Secondary Education/Training (Define the outcome or explain why it's not needed): Luis speaks of going into the army in Puerto Rico when he graduates. He does not express a desire for further education or training.

2. Employment (Define the outcome or explain why it's not needed): Luis does say that he would like to have employment for a good salary when he leaves school, however, he is not clear on what type of job would interest him.

3. Community Living (Define the outcome or explain why it's not needed):

 a) Residential: Luis currently lives with his mother, stepfather, and brothers and sisters. He is very caring and expresses a feeling of responsibility to all his family members. He does not talk much about his own future, accept [sic] that he says that maybe someday he would like to have a nice house.

 b) Recreation/Leisure: Luis plays many sports at the high school, including, football, wrestling and baseball and track. He has become friends with many of the team players and is often socializing with them in the hallways during the school day. Luis continues to require extra-curricula [sic] activities, such as sports, as part of his need for socialization and educational outcomes provided in accordance with IDEA regulations. Luis does not go to school dances or talk yet about dating. He does say that he is waiting for all that for after high school.

This reference to "extra-curricula [sic] activities, such as sports", which appears in a section of the IEP that is intended to provide background about post-school aspirations and not to prescribe special education or related services, is all that is offered from the education records of Luis Cruz as a basis for a federal right to compete in interscholastic athletics under IDEA.

51. After Ridley became aware of Mr. Cruz's ineligibility to participate in interscholastic athletic contests, the IEP team did not take any steps to provide alternatives for recreation, for extra-curricular activities, or for maintaining Mr. Cruz's good pre-employment habits such as his punctuality.

52. There are extracurricular programs at Ridley other than sports in which Mr. Cruz could participate and through which he could interact with peers who do not have disabilities.

53. The P.I.A.A. Age Rule affects a student's eligibility to participate in interscholastic athletic contests, but does not affect a student's eligibility to participate in extra-curricular activities such as pre-season practices, regular-season practices, non-P.I.A.A. competitions, wrestle-offs, intramural scrimmages and other intramural events, or other contests in which the team participates that are not governed by P.I.A.A. rules.

54. Although not required by the P.I.A.A. Age Rule, Ridley has a policy that has precluded Mr. Cruz from participating in practices and other events in which the team participates, on account of Mr. Cruz's age. Ridley has continued to apply that policy to Mr. Cruz notwithstanding Ridley's knowledge that Ridley's policy was not compelled by P.I.A.A. rules.

## II. CONCLUSIONS OF LAW

The plaintiffs claim that defendant has violated (1) the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et. seq.;* (2) Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et. seq.;* (3) the Americans with

Disabilities Act (ADA), 42 U.S.C. § 12101, *et. seq.;* and (4) 42 U.S.C. § 1983.

■ Plaintiff has no constitutional right to participate in interscholastic sports, both sides agree. Plaintiff argues in his § 1983 claim, however, that since sports is included as an integral part of his IEP and therefore is related to his constitutional right to education, the privilege of participating in sports is transformed into a federally protected right. Plaintiffs cite *Crocker v. Tennessee Secondary Sch. Athletic Ass'n,* 735 F.Supp. 753 (M.D.Tenn. 1990), but this case is inapposite as plaintiff's counsel should clearly recognize. In *Crocker,* the plaintiff had requested a due process hearing in connection with his IEP. An administrative judge then ordered that plaintiff must be allowed to participate in extracurricular activities. No appeal was taken from this order. *Id.* at 758.

In this case, as defendant points out, plaintiff has not exhausted administrative remedies before seeking relief under IDEA. (*See* 20 U.S.C. § 1415 dealing with procedural safeguards).

Accordingly, even if plaintiff's theory that the inclusion of interscholastic sports in his IEP transforms the right to participate in interscholastic sports into a federally protected right is a legally correct position, it is inapplicable in this case where plaintiff failed to exhaust administrative remedies before seeking relief under IDEA.

■ With respect to the Rehabilitation Act, 29 U.S.C. § 794(a) provides in part that no individual with a disability shall be subjected to discrimination under any program or activity receiving federal financial assistance. There is no evidence that the defendant receives federal financial assistance. The analysis in *Cureton v. National Collegiate Athletic Association,* 198 F.3d 107, 118 (3d Cir.1999), although involving Section 601 of Title VI, still compels the conclusion that the P.I.A.A. which receives no federal financial assistance is not liable under the Rehabilitation Act.[1]

■ The only remaining claim of plaintiff is under the ADA. The P.I.A.A. is, in my opinion, a public entity under Title II of that Act and plaintiff's claim should be viewed according to its provisions. Thus, the applicable section of the ADA provides:

§ 12132. Discrimination.

Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

The term "qualified individual with a disability" is defined at § 12131(2) as follows:

The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

In construing the Title II statutes I have quoted above, there is a conflict among courts as to whether age is an essential

---

**1.** The Rehabilitation Act language tracks that of Title VI and therefore claims under both provisions only apply where the party creating the challenged policy is a recipient of federal funds. *Id.*

requirement. One case, *Pottgen v. Missouri State High Sch. Activities Ass'n* (MSHSAA), 40 F.3d 926 (8th Cir.1994), sets forth the conflict through its majority and dissenting opinions. In *Pottgen,* after the plaintiff repeated two grades in elementary school, the school discovered that he had learning disabilities.

Plaintiff was active in sports, playing interscholastic baseball three years in high school and planned to play his senior year. However, MSHSAA had the following by-law:

"A student shall not have reached the age of nineteen prior to July 1 preceding the opening of school. If a student reaches 19 on or following July 1, the student may be considered eligible for [interscholastic sports during] the ensuing year."

The majority in *Pottgen* reasoned that to determine whether the plaintiff was a "qualified individual" under ADA, it must first be determined whether the age limit is an essential eligibility requirement by reviewing the importance of the requirement to the interscholastic baseball program. *Id.* at 931.

The court went on to say that MSHSAA demonstrated that the age limit is an essential eligibility requirement since (1) an age limit helps reduce the competitive advantage flowing to teams with older athletes; (2) protects younger athletes from harm; (3) discourages student athletes from delaying their education to gain athletic maturity; and (4) prevents overzealous coaches from engaging in repeated red-shirting to gain a competitive edge. *Id.* at 929.

The court then said that although plaintiff cannot meet the essential eligibility requirements because of his age, he would be otherwise qualified if reasonable accommodations would enable him to meet the age limit. The only accommodation, obviously, would be to waive the age limit rule. But waiving an essential eligibility standard would constitute a fundamental alteration in the nature of the baseball program, and the ADA does not require this result. Consequently, no reasonable accommodation exists. *Id.* at 929–930.

The dissent in *Pottgen* agreed that if a requirement is essential to a program, a waiver or modification would not be reasonable. The question is, "how do we determine what is 'essential'"? Quoting 28 C.F.R. § 35.130(b)(7) (1994) as follows:

A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity;

the dissent then suggests that the question to be answered is whether high school baseball competition in Missouri would be fundamentally altered were plaintiff allowed to play one more year.

The majority in *Pottgen* felt that such an individualized inquiry could not be held until an initial determination was made as previously stated. If the individualized inquiry were made first, "a public entity could never know the outer boundaries of its 'services, programs or activities.' A requirement could be deemed essential for one person with a disability but immaterial for another similarly but not identically, situated individual." *Pottgen,* 40 F.3d at 931.

Two Sixth Circuit cases have essentially agreed with the majority in *Pottgen.* In *Sandison v. Michigan High Sch. Athletic Ass'n, Inc.* (MHSAA), 64 F.3d 1026 (6th Cir.1995), MHSAA had the following regulation:

A student who competes in any interscholastic athletic contests must be under nineteen (19) years of age, except that a student whose nineteenth (19th) birthday occurs on or after September 1 of a current school year is eligible for the balance of that school year.

In *Sandison*, two plaintiffs, Sandison and Stanley, turned 19 in May before their senior year and could therefore not compete in cross country or track. In brief, the court concluded that Sandison and Stanley were excluded by reason of age, not disability, and in its analysis under Title II of the ADA, agreed with *Pottgen* as follows:

> Nor are the plaintiffs likely to succeed in showing that they are "qualified individual[s]" under §§ 12131(2), 12132. Our earlier conclusion that the age restriction is a "necessary" requirement under section 504 foreordains our conclusion now that Regulation I § 2 is an "essential eligibility requirement[ ]" under § 12131(2). *Accord Pottgen*, 40 F.3d at 930–31. We also find that waiver of the age restriction does not constitute a "reasonable modification[ ]" under § 12131(2). *Accord id.* at 931. The daunting task of determining whether an older student possesses an unfair competitive advantage is not a "reasonable modification[ ]," just as the task is not a "reasonable accommodation."

The other Sixth Circuit case, *McPherson v. Michigan High Sch. Athletic Ass'n* (MHSAA), 119 F.3d 453 (6th Cir.1997) involved essentially the same issue although the MHSAA regulation was the 8 semester rule for sports eligibility. The court found that the considerations it found dispositive

in *Sandison* applied to *McPherson*. See *McPherson*, 119 F.3d at 461–462.

Supporting the minority view in *Pottgen*, the Seventh Circuit in *Washington v. Indiana High Sch. Athletic Ass'n* (IHSAA), 181 F.3d 840 (7th Cir.1999) said: "In short, we believe that the analysis of Chief Judge Richard Arnold in dissent in the *Pottgen* case and of the *en banc* majority of the Sixth Circuit in *McPherson*[2] is more compatible with the congressional intent." *Washington* at 850. The court went on to say:

> We think that the individualized approach is consistent with the protections intended by the ADA. The entire point of *Arline's*[3] statement that a person is otherwise qualified if he is able to participate with the aid of reasonable accommodations is that some exceptions ought to be made to general requirements to allow opportunities to individuals with disabilities. To require a focus on the general purposes behind a rule without considering the effect an exception for a disabled individual would have on those purposes would negate the reason for requiring reasonable exceptions. *Id.* at 852.

Finally, this court was waiting for the decision in *PGA Tour, Inc. v. Casey Martin*, 531 U.S. 1049, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001), decided by the Supreme Court on May 29, 2001. The opinion is not directly on point with this case. First, it concerns Title III of the ADA, and second, the causal connection between the disability and the exclusion from an activity is more direct in the *Martin* case. But in *Martin*, the Supreme Court made clear that a basic requirement of the ADA is the evaluation of a disabled person on an indi-

---

**2.** This is a reference to a statement in *McPherson*, 119 F.3d at 463, in which the *en banc* court said it was not insensible to plaintiff's individual situation.

**3.** . *School Board of Nassau County v. Arline*, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987).

vidual basis. According to *Martin,* three inquiries are contemplated by ADA: (1) whether the requested modification is reasonable; (2) whether it is necessary for the disabled individual; and (3) whether it would fundamentally alter the nature of the competition. The case presently before this court, it seems to me, requires the same analysis.

 It is clear from the findings of fact that Luis Cruz would not fundamentally alter the nature of the competition in football and track and that the modification of the age rule is necessary for him to be able to play in interscholastic competition in those two sports. What is more difficult to assess is whether the modification is reasonable. Initially, that involves a determination as to whether the age rule is essential to the P.I.A.A. sports program.

P.I.A.A. contends the age rule is essential to:

(1) protect high school athletes of customary age from the dangers and unfairness of participation with those who are older and thus perhaps physically larger, stronger, and more mature and experienced;

(2) limit the possibility that the team with the average student will gain an unfair competitive advantage over opponents;

(3) have available the maximum number of team positions for high school athletes who are of customary age for students in high school; and

(4) to maintain uniformity of standards with regard to the age of participants.

It now seems clear that a rule is essential to a program unless it can be shown that the waiver of it would not fundamentally alter the nature of the program. This determination must be made on an individual basis. The court has looked at the specific facts applicable to Luis Cruz in reaching its conclusion stated earlier in this opinion. In doing so in this case, it is clear that Luis Cruz playing on the football team and track team would not fundamentally alter the nature of P.I.A.A. interscholastic competition. (*See* Findings of Fact C, Nos. 35, 36 and 38). It is not clear on the record if that can be said about wrestling. (*See* Findings of Fact C, No. 37).

There is another consideration regarding reasonable modification and that is the burden that would be placed upon the P.I.A.A. to administer a waiver rule in connection with age. P.I.A.A. claims that a procedure by which Cruz would be granted a waiver of the age rule would be an undue burden on it. Specifically, the P.I.A.A. argues that requiring it to develop a waiver system which would assess whether an over-age student would have a competitive advantage over opponents in a given sport would be unreasonable as it would require complex fact-finding as well as extremely difficult judgments about leadership skills, motivational abilities, physical maturity, benefits of experience, quickness, agility, strength, and sport-specific abilities which are extremely difficult to measure.

Moreover, the P.I.A.A. argues that

"the facts presented to the court in this case demonstrate the near-impossible nature of implementing a waiver process that involved an assessment of whether allowing a student to participate would constitute a competitive advantage. For example, in football, it is reasonably clear that Mr. Cruz is not an important player, but the skill level of whomever would play in Mr. Cruz's position in his absence is not known. In wrestling, Mr. Cruz's outstanding win/loss record in the most recent season makes it reasonably clear that Mr. Cruz would give a competitive advantage to his team, but the

competitiveness of the wrestler who would in Mr. Cruz's absence is not known. In track, it is reasonably clear that, while Mr. Cruz is not a fast runner, he scores points for his team depending on the number of competitors on the opposing team and on the number of other runners on his team, in a particular event on a given day, but it is not known how many other runners will be available to participate in track meets on any team on any future day."

(Defendant's Conclusion of Law No. 23). It seems to me that the no-cut rule in football and track makes the consideration of whose place Luis Cruz might be taking if he is allowed to play of less significance.

More importantly, in light of the other waivers which the P.I.A.A., through district committees, routinely considers, namely transfer and 8 term waivers (some of which require the determination of athletic intent), and in view of the apparent ability of the P.I.A.A. to make what must be very difficult decisions in those waiver cases, I do not believe that an age waiver rule would put an undue burden on the P.I.A.A. The statistics to date suggest that there may not be many occasions for the age waiver to be requested. (*See* Finding of Fact C, No. 29). On the present record, it does not appear that a waiver process would place an unreasonable burden on the P.I.A.A. Indeed, the waiver process proposed by plaintiffs would require initially that the student seeking the waiver have an IEP which requires participation in interscholastic sports. (*See* Finding of Fact C, No. 31). Again, on this record, the P.I.A.A. should not be unreasonably burdened by such a process.

Moreover, after careful review of the notes of testimony, I find based primarily on Findings of Fact C, Nos. 15, 16, 17, 18 and 19 that Luis Cruz will sustain irreparable harm if he is not permitted to participate in interscholastic competition in football and track because of his reaching age 19 before he could compete in 8 semesters which resulted from his learning disability.

Balancing of the interests here is clearly in favor of plaintiff. He is entitled to the benefits of the ADA. Denying him the relief he is entitled to under law is not in the public interest. Any harm done to the other plaintiff, Ridley School District, resulting from forfeiture of games is moot. It is doubtful that Ridley School District has standing, in any event, in the ADA claim. The order grants relief as to Luis Cruz only.

The order also recognizes that changes may have occurred since the hearing on November 15, 2000, which in fairness to interscholastic competition in general may require a review of Luis Cruz with respect to sports in which I have found his participation would not fundamentally alter the nature of competition.

### *ORDER*

AND NOW, this 27th day of June, 2001, it is hereby ORDERED that Luis Cruz's claim for permanent injunction is GRANTED, as follows:

(1) Defendant is restrained and prohibited from application and enforcement of its by-law as to age ineligibility with respect to Luis Cruz, unless done so pursuant to a waiver rule which provides for an individual evaluation of him.

(2) Thus, as to any interscholastic sports in which Luis Cruz wishes to participate, the defendant must entertain an application for waiver of its by-laws as to age ineligibility rules pursuant to procedures that it establishes.

(3) Failure to adopt such waiver procedures in a timely manner as to Luis Cruz will result under this opinion in his being eligible to participate in interscholastic

football and track for the 2001–2002 school year.