

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-22-2001

# Smith v. Natl Collegiate

Precedential or Non-Precedential:

Docket 97-3346

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Smith v. Natl Collegiate" (2001). *2001 Decisions.* Paper 189.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/189

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 22, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 97-3346 and 97-3347

R. M. SMITH
      Appellant

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
AND ON REMAND FROM THE
SUPREME COURT OF THE UNITED STATES

(D.C. No. 96-cv-01604)
District Judge: The Honorable Donetta W. Ambrose

On Remand from the United States Supreme Court
Submitted pursuant to L.A.R. 34.1(a) on May 18, 2001

BEFORE: NYGAARD, MCKEE, and GREENBERG,
Circuit Judges.

(Filed August 22, 2001)

        Virginia A. Seitz, Esq.
        Sidley & Austin
        1722 Eye Street, N.W., Suite 300
        Washington, DC 20006

         Attorney for Appellant

Carole S. Katz, Esq.
Reed Smith
435 Sixth Avenue
Pittsburgh, PA 15219

John J. Kitchin, Esq.
Robert W. McKinley, Esq.
Swanson Midgley
2420 Pershing Road, Suite 400
Kansas City, MO 64108

Christine A. Ward, Esq.
Sweeney, Metz, Fox, McGrann &
 Schermer
11 Stanwix Street
Pittsburgh, PA 15222

 Attorneys for Appellee

Neena K. Chaudhry, Esq.
National Women's Law Center
11 DuPont Circle, N.W., Suite 800
Washington, DC 20036

 Attorney for Amicus-Appellant

OPINION OF THE COURT

NYGAARD, Circuit Judge.

Once again, we review Renee M. Smith's appeal from the District Court's dismissal for failure to state a claim and its denial of her motion to amend her complaint. Smith alleges that the National College Athletic Association's bylaw, which prohibited her from participating in athletics while enrolled in a graduate program outside her undergraduate institution, violated Title IX of the Education Amendments of 1972. The primary issue we must decide is whether the NCAA can be considered a recipient of federal funds, thereby subjecting it to Title IX. Smith initially attempted to amend her complaint to argue that the NCAA is subject to Title IX because it receives dues from its members universities, which are recipients of federal funds. We accepted this theory in Smith v. NCAA, 139 F.3d 180, 189

2

(3d Cir. 1998). The United States Supreme Court, however, reversed, but left Smith's two alternative theories for bringing the NCAA under the prescriptions of Title IX unresolved. See NCAA v. Smith, 525 U.S. 459, 468-470, 119 S.Ct. 924, 929-30 (1999). Those two theories are now before us in this appeal.

I. BACKGROUND

The NCAA is an unincorporated association comprised of public and private colleges and universities. It is responsible for promulgating rules governing all aspects of intercollegiate athletics, including recruiting, eligibility of student-athletes, and academic standards. By joining the NCAA, members agree to abide by and enforce these rules. Among them is the Postbaccalaureate Bylaw, which allows a postgraduate student-athlete to participate in intercollegiate athletics only at the institution that awarded her an undergraduate degree.

Smith was an undergraduate at St. Bonaventure University, an NCAA member, where she played intercollegiate volleyball in 1991-92 and 1992-93. She chose not to play volleyball during the 1993-94 season. Smith graduated from St. Bonaventure in two and one half years. Thereafter, she enrolled in a post-graduate program at Hofstra University that was not offered at St. Bonaventure. During the 1995-96 academic year, she enrolled in a different post-graduate program at the University of Pittsburgh. Like Hofstra, St. Bonaventure did not offer this program. In both years, Smith sought to play intercollegiate volleyball, but the NCAA denied her eligibility under its Postbaccalaureate Bylaw. The NCAA also declined Hofstra's and the University of Pittsburgh's requests for a waiver of the Bylaw.

In August 1996, Smith filed her initial complaint in this case. She alleged, inter alia, that the NCAA's refusal to grant a waiver excluded her from participation in intercollegiate athletics on the basis of her sex in violation of Title IX.[1] The NCAA moved to dismiss the complaint on

_____

1. Smith also alleged violations of the Sherman Act and state contract law. The District Court dismissed the Sherman Act claim and declined

3

the ground that it failed to allege that the NCAA is a recipient of federal financial assistance, and the District Court agreed. See Smith v. NCAA, 978 F. Supp. 213, 219–20 (W.D. Pa. 1997). Smith then filed a motion for leave to amend her complaint to allege that the NCAA "receives federal financial assistance through another recipient and operates an educational program, or activity which receives or benefits from such assistance." The District Court denied the motion, holding that it was moot.

We reversed. Although Smith's original complaint failed to state a Title IX claim, we held that her allegation that the NCAA receives dues from federally-funded member institutions was sufficient to bring the NCAA "within the scope of Title IX as a recipient of federal funds and would survive a motion to dismiss." Smith, 139 F.3d at 190. The Supreme Court disagreed. It held that the mere fact that an entity receives dues from a federally-funded program is not, by itself, sufficient to render it a recipient of federal funds. See Smith, 525 U.S. at 468, 119 S.Ct. at 929. The Court explained that "[a]t most, the Association's receipt of dues demonstrates that it indirectly benefits from federal assistance afforded its members." Id. Thus, the Supreme Court vacated our decision. It noted, however, that Smith pressed two alternative theories for bringing the NCAA under the purview of Title IX. Specifically, she argued that when a recipient cedes "controlling authority" over a federally funded program, the controlling entity is covered by Title IX. See id. at 469–70, 119 S.Ct. at 930. She also argued that the NCAA directly and indirectly receives federal financial assistance through the National Youth Sports Program ("NYSP")2 and the National Youth Sports

_____

to retain supplemental jurisdiction over the state claims. See Smith v. NCAA, 978 F. Supp. 213, 218, 220 (W.D. Pa. 1997). We affirmed the dismissal of the Sherman Act claim, Smith, 139 F.3d at 187, and the Supreme Court denied certiorari. See Smith, 525 U.S. at 464 n.2, 119 S.Ct. at 927 n.2.

2. The NYSP is a youth enrichment program that provides summer education and sports instruction on NCAA member and non-member institution campuses. The NYSP receives federal financial assistance from the Department of Health and Human Services. See Cureton v. NCAA, 198 F.3d 107, 110 (3d Cir. 1999).

4

Program Fund ("Fund"), which are administered by the NCAA. See id. The Court did not address these theories but instead left them "to the courts below on remand." Id. Accordingly, they are now before us for consideration.

II. DISCUSSION

A. Controlling Authority Theory

Smith first argues that the NCAA is subject to Title IX because it has "controlling authority" over the intercollegiate athletic programs of its member institutions that receive federal financial assistance.3 She seeks to amend her complaint to include this theory.

We have previously addressed whether the NCAA has "controlling authority" over its federally-funded members in the context of Title VI. In Cureton v. NCAA, 198 F.3d 107 (3d Cir. 1999), African-American student athletes alleged that the NCAA's scholastic aptitude test requirements concerning freshman year intercollegiate competition disparately impacted them and thus violated Title VI.4 The NCAA moved to dismiss the complaint arguing, inter alia, that the NCAA does not receive federal funds. See id. at 111.

_____

3. Section 901(a) of Title IX of the Education Amendments of 1972, 20 U.S.C. S 1681(a), provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." Under the Civil Rights Restoration Act of 1987, 102 Stat. 28, 20 U.S.C.S 1687(2)(A), a "program or activity" includes "all of the operations of . . . a college, university, or other postsecondary institution, or a public system of higher education . . . any part of which is extended Federal financial assistance." Intercollegiate athletics is an educational program or activity within the statute. See 20 U.S.C. S 1687; 34 C.F.R. S 106.41. Thus, the NCAA is subject to Title IX provided that it receives federal financial assistance within the meaning of 1681(a).

4. Title VI precludes exclusion from participation in, denial of the benefits of, and discrimination under any program or activity receiving federal financial assistance on account of race, color, or national origin. See 42 U.S.C. S 2000d et seq.

5

The District Court held that the prohibition's disparate impact on African-Americans violated Title VI and its corresponding regulations. The court adopted two distinct theories to support its finding. First, the court determined that the NCAA was an "indirect recipient of federal financial assistance" because it exercised effective control over a block grant given by the United States Department of Health and Human Services to the NYSP. Second, the court held that Title VI covered the NCAA because member schools had vested the NCAA with controlling authority over their federally-funded athletic programs. See id. at 111-12 (citing Cureton v. NCAA, 37 F. Supp.2d 687, 694 (E.D. Pa. 1999)).

We reversed the District Court with respect to both theories. First, we assumed without deciding that the NCAA's relationship with the NYSP and the Fund rendered it an indirect recipient of federal financial assistance. However, we concluded that the regulations implementing Title VI are program specific--that is, they only forbid disparate impact discrimination in programs that actually receive federal financial assistance. Therefore, we held that, to the extent the plaintiffs' claims were predicated upon the NCAA's receipt of federal financial assistance through the Fund, they were insufficient, because the Postbaccalaureate Bylaw was unrelated to the Fund's programs. See id. at 115-16.

Next, we rejected the plaintiffs' "controlling authority" theory. In so doing, we relied upon the Supreme Court's decision in NCAA v. Tarkanian, 488 U.S. 179, 109 S.Ct. 454 (1988). In Tarkanian, the NCAA recommended that the University of Nevada at Las Vegas ("UNLV") suspend its men's basketball coach following the NCAA's investigation into numerous allegations of rules violations. UNLV disagreed with the NCAA's recommendation, but ultimately adopted it. The coach then brought an action under 42 U.S.C. S 1983, claiming that the NCAA was a state actor, because UNLV delegated its functions to the NCAA and ceded its authority both to adopt and enforce rules governing UNLV's athletic programs. The Court held that the NCAA was not a state actor. Although it recognized that the NCAA's rules and recommendations clearly influenced

6

UNLV, it concluded that the University, not the NCAA, made disciplinary decisions concerning its employees. The Court explained that UNLV had choices. It could have retained Coach Tarkanian in spite of NCAA recommendations and risked sanctions, or it could have voluntarily withdrawn from the NCAA. The Court stated that although "UNLV's options were unpalatable does not mean that they were nonexistent." Id. at 198 n.19, 109 S.Ct. at 465 n.19.

Based on the above, we concluded that Tarkanian "makes clear that the NCAA does not `control' its members." Cureton, 198 F.3d at 116. We reasoned that, similar to the personnel and employee decisions at issue in Tarkanian, the ultimate decision as to which freshman will participate in varsity intercollegiate athletics belongs to the member schools. We stated: "The fact that the institutions make these decisions cognizant of NCAA sanctions does not mean the NCAA controls them, because they have the option, albeit unpalatable, of risking sanctions or voluntarily withdrawing from the NCAA." Id. at 116. We also noted that the NCAA's constitution expressly provides for the retention of institutional control over individual athletic programs. See id. at 118. As such, we concluded that:

> [W]e cannot understand how the fact that the NCAA promulgates rules and regulations with respect to intercollegiate athletics somehow means that the NCAA has controlling authority over its members' programs or activities receiving Federal financial assistance. After all, the institutions decide what applicants to admit, what employees to hire, and what facilities to acquire.

Id. at 117–18. Accordingly, we held that the NCAA is not subject to the prohibitions of Title VI because its member institutions do not cede control of their athletic programs to the NCAA.

Finally, we recognized that applying disparate impact regulations to the NCAA would be inconsistent with the contractual character of Title VI. See id. at 118. Specifically, we noted that there is no contractual privity between the Department of Health and Human Services, the Department of Education, and the NCAA with respect to the federal

7

financial assistance to colleges and universities. The NCAA is not in a position to accept or reject the federal funds paid to these institutions. We acknowledged, however, that the absence of contractual privity is not an absolute bar to possessing controlling authority. If an entity truly assumes control of a federally-funded program, then it is in a position to accept or reject that control as part of its decision whether or not to receive funds indirectly. Nonetheless, we noted that, where there is an absence of privity, courts should be cautious in imposing Title VI. See id. at 118.

Our decision in Cureton precludes Smith's "controlling authority" argument in the context of Title IX. Smith's theory is identical to the one alleged and rejected in Cureton. Like the Cureton plaintiffs, Smith alleges that the NCAA exercised controlling authority over its federally-funded member institutions because it had the power to establish rules governing intercollegiate athletics at member schools and made individual eligibility and waiver decisions. Smith alleges nothing new with respect to the NCAA's purported control over its members. Compare Appellant's Br. at 19 ("[T]he NCAA has the power to establish rules governing intercollegiate athletics at member schools, including rules concerning eligibility . . . thus has effective control over eligibility determination and is the entity most responsible for discrimination that might enter into such determinations."), with Cureton, 198 F.3d at 117-18 ("We emphasize that the NCAA members have not ceded controlling authority to the NCAA by giving it the power to enforce its eligibility rules directly against the students."). Similar to the plaintiffs in Cureton, Smith is attacking an eligibility rule that NCAA members may choose to enforce or ignore. As such, Cureton directly controls.5 Accordingly,

_____

5. We note that the United States District Court for the District Court of New Jersey has interpreted Cureton in this manner. Specifically, in Bowers v. NCAA, 118 F. Supp. 2d 494 (D.N.J. 2000), the District Court examined whether the NCAA is a recipient of federal funds, thereby subjecting it to the restrictions of S 504 of the Rehabilitation Act. In addition to several other theories, the plaintiff contended that the NCAA is a recipient of federal funds because the NCAA's member institutions, which receive federal funding, have ceded "controlling authority" over

8

Smith is precluded from amending her complaint to include her "controlling authority" theory, as it is futile. See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997) ("An amendment is futile if the complaint, as amended, would not survive a motion to dismiss for failure to state a claim upon which relief could be granted.").

The fact that Cureton concerned Title VI rather than Title IX does nothing to alter its impact on the present case. As the Supreme Court noted in Smith, the scope of Title VI is defined in terms nearly identical to Title IX. Smith, 525 U.S. at 466 n.3, 119 S.Ct. at 928 n.3. Courts have consistently applied the same legal analysis to construe Title VI and Title IX. Therefore, our discussion of the controlling authority theory in the context of Title VI is applicable to Title IX claims.

Smith alleges that the Supreme Court's decision in Brentwood Academy v. Tennessee Secondary School Athletic Ass'n, 121 S.Ct. 924 (2001), demonstrates that our rejection of the "controlling authority" theory in Cureton was incorrect. In Brentwood, a private high school sued a state interscholastic athletic association under 42 U.S.C. S 1983, seeking to prevent the enforcement of a rule that prohibited the use of undue influence in the recruitment of student athletes. The association regulated interscholastic athletic competition among public and private secondary schools. The issue before the Court was whether the enforcement of the association's rules constituted state action. The Court answered in the affirmative based upon

_____

intercollegiate athletics to the NCAA. Following our holding in Cureton, the court rejected the plaintiff 's argument. The court stated:

> Bowers also argues that the NCAA is a recipient of federal funds because the NCAA's member institutions have "ceded controlling authority" over intercollegiate athletics to the NCAA and because the
> NCAA's member institutions receive federal funds. The Third Circuit has explicitly rejected this argument as a basis for finding that the
> NCAA is a recipient of federal financial assistance.

Id. at 527 n.25 (emphasis added). We agree with the District Court of New Jersey's interpretation of Cureton.

9

the "pervasive entwinement" of state school officials in the association's structure. See id. at 927–29.

The Court reasoned that "the nominally private character of the association is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings, and there is no substantial reason to claim unfairness in applying constitutional standards to it." Id. at 932. In particular, the Court noted that the association was largely an organization of schools, 84% of which were public. Under the association's bylaws, each member school was represented by its principal or a faculty member. These representatives selected members of the governing legislative council and board of control from eligible principals, assistant principals, and superintendents. Moreover, the Court pointed out that public school officials not only controlled, but overwhelmingly performed, all but the purely ministerial acts by which the association existed and functioned in practical terms. As such, the entwinement of the public schools and the association was pervasive. See id. at 932–33.

The Court also discussed and distinguished its earlier decision in Tarkanian, where it had held that the NCAA was not a state actor. It initially noted that in Tarkanian, various factors supported a conclusion that the NCAA was a state actor. For example, UNLV had some part in setting the NCAA's rules. Additionally, the Supreme Court of Nevada had determined that UNLV had delegated its traditionally exclusive public authority over personnel to the NCAA. See id. at 931. However, Tarkanian ultimately held that the NCAA was not a state actor because its policies were shaped by several hundred member institutions, most of them having no connection with Nevada, and exhibiting no color of Nevada law. See id. The Court then pointed out that, contrary to the NCAA, the state association before it was an organization whose member schools are all within a single state. In light of this difference, Tarkanian did not apply. See id. (stating that "dictum in Tarkanian pointed to a contrary result on facts like ours . . . .").

10

According to Smith, Brentwood implies that Cureton incorrectly interpreted Tarkanian to conclude that the voluntary nature of the NCAA's relationship with its members undermined its "controlling authority." In other words, Brentwood holds that the voluntary nature of an association, i.e., the fact that members are free to depart, is not determinative of whether members are "entwined with, or under the control of " the association. Thus, she contends that Tarkanian's determination that the NCAA was not a state actor turned primarily upon the fact that NCAA members were not within a single state (Nevada), rather than upon the voluntary nature of their relationship with the NCAA. In support of this contention, she relies on the following language:

> Since it was difficult to see the NCAA, not as a collective membership, but as a surrogate for the one State, we held the organization's connection with Nevada too insubstantial to ground a state action claim.
>
> But dictum in Tarkanian pointed to a contrary result on facts like ours, with an organization whose member public schools are all within a single State.

Id. at 932. She also points to the Court's remarks that "it avails the Association nothing to stress that the State neither coerced nor encouraged the actions complained of " and "[n]o school is forced to join." Id. at 928, 934. In light of this language, she contends that Cureton's "broader reading" of Tarkanian is no longer viable.

We disagree with Smith's contention that, in the wake of Brentwood, our interpretation of Tarkanian is flawed. Although the NCAA's "collective membership" of varying states largely motivated the holding in Tarkanian, the Court nonetheless expressly relied upon the NCAA members' voluntary relationship with the NCAA. Indeed, after explaining that the NCAA cannot be considered a state actor because a vast number of states shape its policy, the Tarkanian Court stated, "[s]tate action nonetheless might lie if UNLV, by embracing the NCAA's rules, transformed them into state rules and the NCAA into a state actor." Tarkanian, 488 U.S. at 194, 109 S.Ct. at 463 (emphasis

11

added). The Tarkanian Court then went on to explain that this transformation did not occur because the "UNLV retained the authority to withdraw from the NCAA and establish its own standards." Thus, it concluded that "[n]either UNLV's decision to adopt the NCAA's standards nor its minor role in their formulation is a sufficient reason for concluding that the NCAA was acting under color of Nevada law when it promulgated standards governing athlete recruitment, eligibility, and academic performance." Id. at 195, 109 S.Ct. at 463–64.

Further, the Court explained that the NCAA's investigation, enforcement proceedings, and consequent recommendations did not constitute state action. The Court noted that although

> it is true that a State may delegate authority to a private party and thereby make the party a state actor, . . . UNLV delegated no power to the NCAA to take specific action against any university employee. The commitment by UNLV to adhere to NCAA enforcement procedures was enforceable only by sanctions that the NCAA might impose on UNLV itself.

Id. at 195–96, 109 S.Ct. at 464. Finally, the Court rejected Tarkanian's argument that the NCAA's "power is so great that the UNLV had no practical alternative to compliance with its demands." It stated: "The university's desire to remain a powerhouse among the Nation's college basketball teams is understandable, and nonmembership in the NCAA obviously would thwart that goal. But that does not mean that [alternatives] were nonexistent." Id. at 465 n.19, 109 S.Ct. at 465 n.19.

As the above language indicates, Tarkanian's discussion of UNLV's influence on NCAA rulemaking is distinct from its examination of whether UNLV ceded its authority to the NCAA. Thus, Brentwood did not abandon Tarkanian's discussion and holding regarding the NCAA's alleged control over its members; rather, it simply distinguished Tarkanian, pointing out that, in contrast to the state association before it, the NCAA's policies were not shaped by one state alone. Accordingly, Tarkanian is still intact and Cureton's interpretation is sound.

12

Smith also contends that Brentwood suggests that a less restrictive standard than "controlling authority" governs Title IX liability. Specifically, she argues that the NCAA was "pervasively entwined" in the operations of its members and thus is subject to Title IX. We disagree. The Supreme Court in Brentwood stated: "We have treated a nominally private entity as a state actor when it is `entwined with governmental policies' or when government is `entwined in [its] management or control.' " 21 S.Ct. at 930 (citations omitted). Similar to "pervasive entwinement,""controlling authority" exists when a public entity receiving federal dollars has delegated control to a private actor or is "entwined in its management or control." Although the "public entwinement" theory differs from the"controlling authority" theory in that it focuses on whether a public entity controls or manages a private entity, its requirement of control is no less rigorous. Thus, we do not think the standards substantially differ.

In addition, Smith contends that Cureton does not apply to the present case because it is procedurally distinguishable. Specifically, she argues that Cureton examined the NCAA's controlling authority on appeal from summary judgment. In contrast, Smith is appealing from an order granting a motion to dismiss and denying a motion for leave to amend her complaint. Therefore, she contends that she should be permitted to conduct discovery to determine whether her case is factually distinguishable from Cureton. She concedes, however, that member institutions currently retain the choice to risk sanctions or withdraw from the NCAA if they do not want to abide by its rules and regulations. See Appellant's Br. at 19. As we explained in Cureton, although this option is unpalatable, it is nonetheless an option. Moreover, Smith does not contest that member institutions still "decide what applicants to admit, what employees to hire, and what facilities to acquire." These facts heavily influenced our decision in Cureton. Therefore, the differences in procedural posture do not require that Smith be allowed to conduct discovery.

13

B. The NCAA's Relationship with the NYSP

Smith also argues that the NCAA is subject to Title IX because it receives federal financial assistance through the NYSP and the Fund.6 The NCAA does not challenge this assertion and instead suggests that we remand to the District Court for discovery and resolution of "whether the NCAA's relationship with the NYSP is sufficient to subject it to Title IX coverage." We agree and hold that Smith's allegations regarding the relationship between the NYSP, the Fund, and the NCAA, if proven, would establish that the NCAA is a recipient of federal funds within the meaning of Title IX.

Under federal regulations, a "recipient" of federal financial assistance is defined as,

> any public or private agency, institution or organization, or other entity, or any other person, to whom Federal financial assistance is extended directly or through another recipient and which operates an educational program or activity which receives or benefits from such assistance, including any subunit, successor, assignee, or transferee thereof.

34 C.F.R. S 106.2(h). Thus, an entity may receive federal financial assistance indirectly and still be considered a recipient for purposes of Title IX. See Grove City Coll. v. Bell, 465 U.S. 555, 563–70, 104 S.Ct. 1211, 1216–19 (1984). In Grove City College, the Court held that Grove City College was an indirect recipient as a result of the federal grant money that students used to pay their tuition bills. The Court reasoned that Congress ultimately intended colleges and universities to receive the grant money at issue, even if it was transferred through students. See id.

Later, in Department of Transportation v. Paralyzed Veterans of America, 477 U.S. 597, 106 S.Ct. 2705 (1986),

_____

6. It is important to note that if the NCAA is a federal funding recipient based on the NYSP's receipt of federal dollars, then all of the NCAA's programs fall under Title IX's proscriptions, including its implementation of the Postbaccalaureate Bylaw, which is at issue in this case. See 20 U.S.C. S 1687 (Civil Rights Restoration Act of 1997) (amending Title IX to define "program or activity" to include institution wide coverage).

the Court drew the distinction between entities that indirectly benefit from federal financial assistance and those that indirectly receive assistance. It held that S 504 of the Rehabilitation Act of 1973 does not apply to commercial airlines by virtue of financial assistance the government provides to airports.7 The Court concluded that S 504 covers those who receive the aid, but not those who merely have a beneficial relationship with entities receiving such assistance. The Court's decision relied upon Congress' power to enact the Rehabilitation Act pursuant to the Spending Clause of the Constitution. The Court stated that: "Congress limited the scope of S 504 coverage as a form of contractual cost of the recipient's agreement to accept the federal funds." Id. at 605, 106 S.Ct. at 2711. It concluded that commercial airlines, although beneficiaries of the funding, were not "recipients" of the assistance because only the airport operators were "in a position to accept or reject their obligations as a part of the decision whether or not to `receive' federal funds." Id. at 606, 106 S.Ct. at 2711. As such, the intent of the grant-maker is not the only relevant consideration regarding whether an entity is an indirect recipient of federal financial assistance. Courts should also consider the degree to which the entity is able to control decisions made with respect to the money, the most important decision being whether the grant money should be accepted at all.

Here, Smith alleges that the NCAA indirectly received federal financial assistance by virtue of its relationship with the NYSP and the Fund. According to Smith, the NCAA effectively controlled the NYSP and the Fund. Specifically, she alleges inter alia, that: 1) the NYSP Committee was an NCAA committee responsible for the administration of the NYSP; 2) the Council of the NCAA, the entity that directed the general policy of the NCAA during certain periods, limited the powers of the Fund's Board of Directors; 3) the Executive Director of the NCAA and the chairperson of the NYSP Committee were ex officio members of the Fund's Board of Directors; 4) all of the members of the Fund's

_____

7. Section 504 prohibits discrimination based on disability in substantially the same terms that Title IX uses to prohibit gender discrimination.

15

Board were either employees of the NCAA or members of the NCAA's NYSP Committee; 5) the Fund had to report to the Council of the NCAA on an annual basis; 6) upon dissolution of the Fund, its assets will be distributed exclusively to the NCAA; and 7) the NCAA's Executive Director remarked that the NYSP is "one of the NCAA's best kept secrets." Appellant's Br. at 13–14 (citing Bowers v. NCAA, 9 F. Supp. 2d 460, 493–94 (D.N.J. 1998)).

In our view, these allegations, if proven, are sufficient to bring the NCAA under the purview of Title IX. Although we are hesitant to impose Title IX obligations on an entity that is not a direct recipient of federal financial assistance, we have nonetheless noted that "those who truly assume control of federally-funded programs are in a position to accept or reject that control as part of a decision whether or not to receive the federal funds indirectly." See Cureton, 198 F.3d at 118. We believe that Smith's allegations establish that the NCAA "truly assum[ed] control" of the NYSP and its Fund. Smith's allegations render the NCAA, the NYSP, and the Fund virtually indistinct. In light of this alleged control, the NCAA did more than "indirectly benefit" from federal assistance like the commercial airlines in Paralyzed Veterans; rather, through the NYSP and its Fund, it was in a "position to decide whether to`receive' federal funds and thereby accept the concomitant obligations of [Title IX]." Paralyzed Veterans, 477 U.S. at 606; 106 S.Ct. at 2711.

Several district courts have arrived at this same conclusion.8 First, in Cureton v. NCAA, No. Civ. A. 97–131, 1997 WL 634376 (E.D. Pa. Oct. 9, 1997), the United States District Court for the Eastern District of Pennsylvania examined the NYSP relationship theory in the context of the NCAA's motion for summary judgment against student athletes who alleged violations under Title VI. The court held that "if the National Youth Sports Program Fund is nothing more than a sham to disguise the NCAA's use of

_____

8. Additionally, the Department of Health and Human Services has issued two letter determinations that the NCAA is a recipient of federal assistance by virtue of the Department's grant to the NYSP Fund. See Appellant's Br. at 14 n.2.

16

federal funds for its own benefit, then the NCAA does receive federal financial assistance." Id. at *2. However, based on the record before it, the court was unable to make a determination. As such, it denied the motion and held that, at trial, the plaintiffs had to prove that the NCAA received federal financial assistance.

Similarly, in Bowers v. NCAA, 9 F. Supp. 2d 460 (D.N.J. 1998), the United States District Court for the District of New Jersey dismissed the NCAA's motion for summary judgment in a suit claiming discrimination underS 504 of the Rehabilitation Act. Bowers made extensive findings to support its conclusion that there was a genuine issue of material fact regarding "whether the NCAA receives federal funds through the [Fund] or whether the NCAA is intertwined with the [Fund] such that it cannot be considered separate." Id. at 494. Smith's allegations mirror these findings.

The District Court revisited the issue two years later. See Bowers v. NCAA, 118 F. Supp. 2d 494 (D.N.J. 2000). The court found that "there is evidence that the NCAA may be in control of the NYSP and the federal funds the NYSP receives." Id. at 528. In particular, it noted that the NYSP was established in 1969 and was run exclusively by the NCAA until 1989, when a not-for-profit corporation, the Fund, was created to administer the NYSP. According to a member of the NYSP's Board of Directors, the Fund was established because the NCAA wanted to ensure that it was not a recipient of federal grant dollars or a contractor with the federal government. The court explained that, despite the creation of the Fund, the NCAA's role in relation to the NYSP essentially remained the same. For example, it administers the Fund for a fee of one dollar per year. The Fund has no employees and its business address is the same as the NCAA's. Moreover, the court stated that the NCAA "seems to have the ability to influence significantly how the NYSP's federal funding is spent[ ]" given the involvement of the NCAA with the Fund's Board of Directors. Id. at 528. In spite of some evidence to the contrary, the court held that there was a genuine issue of material fact as to whether the NCAA was a recipient of federal financial assistance. The court concluded,"[t]o

17

ignore this evidence and hold that the NCAA does not exercise control over the [Fund's] federal funding would be to elevate form over substance in a way that should not be countenanced." Id. at 529.

We agree with the District Courts of Pennsylvania and New Jersey. Amending Smth's complaint to include an allegation that the NCAA is a federal funding recipient by virtue of its relationship with the NYSP and the Fund would allow it to survive a motion to dismiss and thus would not be futile. See Cureton, 198 F.3d at 190 (citations omitted) (explaining that a district court justifiably may deny leave to amend on grounds such as undue delay, bad faith, dilatory motive, and prejudice, as well as on the ground that an amendment would be futile). In other words, Smith's complaint, as amended, would survive a motion to dismiss for failure to state a claim upon which relief can be granted. See id. at 190 (citations omitted) (explaining that an amendment is futile if the complaint, as amended, would not survive a motion for failure to state a claim upon which relief could be granted). As such, we will remand to the District Court to allow Smith to amend her complaint to include the NYSP relationship theory. The District Court should conduct discovery and make findings with respect to this allegation.9

III. CONCLUSION

For the foregoing reasons, we will reverse the District Court's denial of Smith's motion to amend her complaint with respect to her Title IX claim. In light of this conclusion, we will remand to the District Court for further proceedings consistent with this opinion.

_____

9. We emphasize that we make no findings of fact. Rather, we simply hold that Smith presents a viable theory for subjecting the NCAA to Title IX's requirements and thus her proposed amendment would not be futile. We hold no opinion as to whether Smith's allegations are true or whether the NCAA ultimately controlled the NYSP and the Fund. These are questions for the District Court to determine.

18

McKEE, Circuit Judge, concurring:

I join part II B —- The NCAA's Relationship with the NYSP -- fully, and without reservation. However, I concur with the discussion in part II A —- Controlling Authority Theory only because I agree that we are bound by the panel's decision in Cureton v. National Collegiate Athletic Association, 198 F.3d 107 (1999, 3rd Cir) (McKee, J. dissenting). See I.O.P. 9.1 ("no subsequent panel overrules the holding in a published opinion of a previous panel.").

Inasmuch as I have previously noted why I believe that the decision in NCAA v. Tarkanian, 488 U.S. 179 (1988) supports the argument that there are material issues of fact as to whether the NCAA can be subject to Title IX under the Controlling Authority Theory, I will not reiterate my position here in detail. Rather, I rely upon the lengthy discussion of Tarkanian that I set forth in my dissenting opinion in Cureton. See Cureton, 198 F.3d at 122–126.

There, I noted that the Supreme Court's conclusion that the relationship between the NCAA and the University of Nevada at Las Vegas ("UNLV") established only that UNLV was not a state actor. The Court left open the issue before us; whether that relationship is such as to allow the plaintiffs to succeed under a "controlling authority" theory of recovery. Nothing in my colleagues' discussion of the issues sub judice convinces me that my reading of Tarkanian is erroneous insofar as it relates to"controlling authority" liability under Title IX. In fact, it only reinforces my belief that we incorrectly decided Cureton.

The majority relies upon the fact that " `UNLV's options [in Tarkanian] were unpalatable does not mean that they were nonexistent.' " Maj. op. at 7 (quoting Tarkanian, 488 U.S. at 198 n. 19). However, the Court's pronouncement must be read in context with the state action analysis it was undertaking. It does not control our inquiry into whether the NCAA is a "controlling authority." I am not nearly as impressed as the majority that the Court in Tarkanian, held that UNLV was not a state actor because it had unpalatable choices. Consider a scenario where A can impose such unpalatable consequences upon B that B has no choice but to submit to A's will. A is controlling B. That

19

practical reality is not altered by the theoretical possibility that B can defy A at A's peril and pay dearly for the act of defiance. In fact, this is precisely how power and control are exercised and manifested. Other than direct administrative or legal control, I can think of no better way for one entity to control another than by making the cost of defiance so high that the controlled entity's only realistic alternative is submission. The NCAA clearly imposed its will on UNLV in Tarkanian and forced the university to do something that was against the will of the university's top administrators, and which they thought was unfair. Accordingly, Tarkanian does not support denying the plaintiff 's "controlling authority" theory as a matter of law. However, our holding in Cureton does. Therefore, I must concur in the majority's opinion.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit